**Maria CEBALLOS, Plaintiff,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

**No. 84 Civ. 9039 (RJW).**

United States District Court, S.D. New York.

Dec. 9, 1986.

Maria Ceballos, pro se.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Donna H. Lieberman, Asst. U.S. Atty., of counsel.

ROBERT J. WARD, District Judge.

Plaintiff Maria Ceballos brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act") as amended, 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final decision by the defendant Secretary of Health and Human Services (the "Secretary" of "HHS") denying her application for Supplemental Security Income ("SSI") based on disability (hereinafter "disability benefits"). Although plaintiff has a severe psychiatric impairment, the Secretary held

that plaintiff did not suffer from a disability within the meaning of the Act because she retained a residual functional capacity to perform simple, repetitive, low stress, unskilled work. The Secretary has moved for judgment on the pleadings under Rule 12(c), Fed.R.Civ.P. For the reasons to follow, the Court denies the Secretary's motion. The Secretary's decision is reversed and the case is remanded for reconsideration.

## BACKGROUND

Ceballos was born in Puerto Rico on November 4, 1936. She came to the United States in 1979. Plaintiff is separated from her husband and now lives with one of her two adult daughters in New York in a third floor apartment. She has been receiving welfare for the last seven years. Ceballos is literate in Spanish and attended school in Puerto Rico for twelve years, but did not graduate from high school. According to the administrative record, claimant has not engaged in any substantial gainful activity during the past fifteen years. She did, however, at one point since coming to the United States perform some minimal part time work in a flower shop.

Ceballos applied for disability benefits on June 29, 1983 on the basis of an emotional condition, a heart disorder, a hernia, arthritis, and a thyroid condition. The Secretary denied claimant's application initially and on reconsideration. Claimant timely filed a request for a hearing, which was held before Administrative Law Judge Roy Liberman (the "ALJ") on May 24, 1984. Claimant appeared at the hearing with a representative of the United Welfare League. In a written decision issued on July 2, 1984, the ALJ determined that plaintiff was not

eligible for disability benefits because she was not disabled within the meaning of the Act. The appeals council denied plaintiff's request for a review of the ALJ's decision on October 11, 1984. Plaintiff then filed this action for judicial review of the Secretary's final determination. The Secretary has moved for judgment on the pleadings.

## DISCUSSION

1. The Disability Reform Act of 1984.

Ceballos applied for disability benefits at least in part on the basis of mental impairments. Congress passed the Social Security Disability Reform Act of 1984 (the "Disability Reform Act"), P.L. 98–460, 98 Stat. 1794, to clarify statutory guidelines for determining qualification for disability benefits. In section 5(c) Congress directed the Secretary within nine months to revise the Social Security Administration's ("SSA") Listing of Mental Impairments and to re-evaluate the agency's procedure for predicting the ability to work of mentally impaired individuals. The Secretary published the new regulations August 28, 1985. See 50 Fed.Reg. 35,065 (1985) (codified at 20 C.F.R. § 404 subpt. P app. 1). In the interim, the Secretary was to make determinations of disability on the basis of mental impairments in accordance with then current guidelines, but unfavorable decisions reached after the bill's enactment on October 9, 1984 were to be reviewed under the newly revised regulations.[1]

When the appeals council denied plaintiff's request to review the ALJ's decision on October 11, 1984, the ALJ's opinion became the Secretary's final decision. Ceballos then falls within that group of claim-

---

1. Section 5(c)(1) states, in pertinent part, as follows:

Any initial determination that an individual is not under a disability by reason of a mental impairment and any determination that an individual is not under a disability by reason of a mental impairment in a reconsideration of or hearing on an initial disability determination made ... after the date of the enactment of this Act and prior to the date on which revised criteria are established ... and

any determination that an individual is not under a disability by reason of a mental impairment in a reconsideration of, hearing on, review by the Appeals Council of, or judicial review of a decision rendered in any continuing eligibility review ..., shall be redetermined by the Secretary as soon as feasible after the date on which such criteria are so established, applying such revised criteria.

Disability Reform Act, P.L. No. 98–460, § 5(c)(1), 98 Stat. 1794, 1801–02.

ants whose applications should be remanded for reconsideration in light of the new mental impairment guidelines.[2] Accordingly, the Court denies the Secretary's motion for judgment on the pleadings and remands this case for reconsideration.

## II. Review of the Secretary's Determination.

On remand to reconsider Ceballos' mental impairments under the new guidelines, the Secretary would not necessarily review the ALJ's factual findings on those mental impairments, the balance of Ceballos' application that is based on physical rather than mental ailments, or the adequacy of the hearing Ceballos received. In the interest of economy, the Court will take this opportunity to review the Secretary's decision rather than await a second appeal should he determine that Ceballos is not mentally disabled under the new regulations.

### A. Standards of Review.

The legal principles that govern the review are well settled. "Disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The mere presence of an impairment is not disabling within the meaning of the Act. Rather, a person may be determined to be under a disability only if his or her impairment is of such severity that the claimant is not only unable to do his or her previous work, but cannot engage in any kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The initial burden of proving disability is on the claimant. 42 U.S.C. § 423(d)(5); *see*

*Schauer v. Schweiker,* 675 F.2d 55 (2d Cir. 1982); *Carter v. Schweiker,* 649 F.2d 937, 940 (2d Cir.1981). The claimant satisfies this burden by making out a *prima facie* case, that is, by showing that his or her impairment prevents return to his or her prior employment. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). The burden then shifts to the Secretary, who must produce evidence to show the existence of alternative substantial gainful work that exists in the national economy and that the claimant could perform. *Id.*

In reaching a conclusion as to disability, both objective and subjective factors are to be considered. These include objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain or disability testified to by the claimant or other witnesses, and the claimant's education background, age, and work experience. *Rivera v. Harris,* 623 F.2d 212, 216, (2d Cir.1980); *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978). These factors need not be given equal weight. Within the Second Circuit, the "treating physician" rule establishes the weight to be given the medical opinion of the physician who has treated the claimant relative to other medical evidence, including the opinions of other physicians.

The rule, which has been the law of this circuit for at least five years, provides that a treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is; (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any

---

**2.** As the court in *Christensen v. Bowen,* 633 F.Supp. 1214, 1219 (N.D.Cal.1986), observed, a logical construction of the statute would indicate that it requires evaluation under the new criteria only of cases finding nondisability upon the completion of judicial as well as administrative review as long as the review had commenced during the transition period. The district court need not remand a case in which the administrative record establishes eligibility. In this case, however, the Court cannot say that the record would warrant a finding of disability under either the original or the revised listing of mental impairments.

substantial evidence to the contrary remains the responsibility of the fact-finder.

*Schisler v. Heckler,* 787 F.2d 76, 81 (2d Cir.1986) (citing *Bluvband v. Heckler,* 730 F.2d 886, 892–93 (2d Cir.1984)). The merits of this rule are not in issue. *Havas v. Bowen,* 804 F.2d 783, 785 (2d Cir.1986) (Secretary has made no attempt to appeal the rule to the Supreme Court and denies following policy of nonacquiescence); *Schisler v. Heckler, supra,* 787 F.2d at 83 (same).

■ The Secretary has the duty of making the determination of disability under the principles set forth above. It is not the function of this Court, which sits in the present context as a reviewing court, to determine *de novo* whether the claimant is disabled. Assuming the Secretary has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence. If they are so supported, they are conclusive. 42 U.S.C. § 405(g). *See Rivera v. Harris, supra,* 623 F.2d at 216; *Bastien v. Califano, supra,* 572 F.2d at 912. Where evidence has not been properly evaluated because of the application of an erroneous legal standard, however, the determination of the Secretary may not be upheld. *See Marcus v. Califano,* 615 F.2d 23, 28 (2d Cir.1979). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126

(1938)). *See generally Parker v. Harris, supra,* 626 F.2d at 230–32.

■ Additionally, the reviewing court must determine that the claimant has received a full and fair hearing. Because a hearing on disability benefit entitlement is not an adversarial proceeding, the ALJ incurs a general obligation affirmatively to develop the record to ensure that all the necessary and relevant information is produced. *Echevarria v. Secretary of HHS,* 685 F.2d 751, 755 (2d Cir.1982). That a claimant is represented by counsel or a paralegal does not obviate this affirmative duty to develop the record. *See, e.g., Decker v. Harris,* 647 F.2d 291, 299 (2d Cir. 1981).

B. The Secretary's Determination.

The Secretary assessed whether plaintiff was suffering from a disability as defined under the Act by following a five step sequential evaluation process, of which the "severity regulations" are a part.[3] The Second Circuit recently described the process mandated by the Secretary's regulations as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied. 20 C.F.R. §§ 404.1520(a), (b), 416.920(a), (b) (1983). If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in subpt. P, app. 1, of the social

---

**3.** The regulations promulgated by the Secretary are the subject of litigation in another action in this district, *Dixon v. Heckler,* No. 83 Civ. 7001 (MEL) (S.D.N.Y.). In a decision dated June 22, 1984, Judge Lasker granted plaintiffs' motion for a preliminary injunction preventing the Secretary from enforcing the severity regulations. *Dixon v. Heckler,* 589 F.Supp. 1494 (S.D.N.Y. 1984), aff'd, 785 F.2d 1102 (2d Cir.1986). In this case, once the ALJ determined under step two of the severity regulations that Ceballos' impairments were not disabling, he nonetheless went

on to consider, albeit superficially, steps four and five, which require consideration of a claimant's age, education, past work experience, and residual functional capacity on the ability to perform other gainful work. Ceballos therefore is not a member of the *Dixon* class. Judge Lasker's order requiring the Secretary to consent to or to move for remand in all cases involving *Dixon* class members, therefore, does not reach Ceballos. *Dixon v. Heckler, supra,* (July 25, 1984).

security regulations, 20 C.F.R. §§ 404.-1520(d), 416.920(d). These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits. If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied. 20 C.F.R. §§ 404.1520(d), 416.920(e). If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." *Decker v. Harris,* 647 F.2d 291, 298 (2d Cir.1981); 20 C.F.R. §§ 404.-1520(f), 416.920(f). If not, benefits are awarded.

*Dixon v. Heckler,* 785 F.2d 1102 (2d Cir. 1986) (quoting *City of New York v. Heckler,* 742 F.2d 729, 732 (2d Cir.1984), *aff'd,* — U.S. —, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986)).

### 1. The ALJ's Decision.

In evaluating Ceballos' application, the ALJ found as step one that she had not engaged in any substantial gainful activity since June 29, 1983. (Tr. 11). Under step two, the ALJ found that claimant suffered from a "severe psychiatric impairment, namely a depressive neurosis," "low back pain and [a] thyroid condition." (Tr. 11). As step three, the ALJ decided that none of Ceballos' conditions, considered separately or in combination, equalled any of the "Listing of Impairments" found in Appendix 1. Specifically, the ALJ found that

none of Ceballos' problems "significantly limit[ed] her ability to engage in basis work activities of a physical nature" or create any exertional limitations. (Tr. 11–12). In reaching that conclusion the ALJ discounted Ceballos' subjective testimony concerning her complaint as "lacking in credibility due to exaggeration and inconsistencies." *Id.* Step four by which the Secretary assesses whether claimant's residual functional capacity permitted a return to her prior job was, in light of Ceballos' work experience, moot. Despite the lack of any prior work experience or "any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work," (Tr. 12), the ALJ baldly asserted by way of conclusion that "[c]onsidering the range of work at all exertional levels which the claimant is still functionally capable of performing, in combination with her age, education, and work experience, and using the above cited Section 204.00 as a framework for decision making, the claimant is not 'disabled,' " (Tr. 12), and "has the residual functional capacity to perform simple, repetitive low stress, unskilled work." *Id.*

### 2. Medical Evidence.

The relevant medical evidence in this case is contained in the two reports of plaintiff's treating physician, Dr. Luis R. Locuratolo, and those of several consultative physicians, all of whom examined plaintiff at the Administration's behest.[4] Dr. Locuratolo, a board certified specialist in psychiatry and neurology, has been treating Ceballos since February 17, 1981 for her psychiatric problems and seemingly for various physical conditions as well. In a letter dated June 23, 1983, Dr. Locuratolo opined that Ceballos "has been suffering from *severe to moderate emotional disorders* (confusion like states & hallucination) & also *heart disorders & discal hernia arthritis & thyroid*—Needs long standing treatment, unable to hold a job as to sup-

---

**4.** The reports in the transcript were all received prior to the hearing or admitted in evidence during the hearing except the letter and report

of Dr. Brian Rubin that were admitted subsequent to the hearing.

port herself." (Tr. 77) (emphasis in the original). Dr. Locuratolo elaborated on Ceballos' health in a second letter dated May 22, 1984.

> She has been suffering from *mental disorders* (anxieties & depression & confusion & borderline psychosis=fears & primary *auditory hallucinations*) & *low back pains* (chronic-due to *discal hernia*) & *heart condition & dizzy spells & anemia & arthritis*-She appears in need of *a long standing treatment* to prevent her *worsening—She is clearly unable to hold a job (gainful & substantial) as to support herself for 12 consecutive months.*

(Tr. 134) (emphasis in the original). The letter noted as well that Ceballos was taking Triavil, Ativan, Motrin, Flexeril, Elavil, Synthroid, Nitrostat with nitroglycerin, Tri-Heruic, and Feosol. Ceballos continues to see Dr. Locuratolo.

Although the report of a treating physician is not dispositive, the Secretary must provide specific, legitimate, detailed reasons for disagreeing with it. *See Murray v. Heckler*, 722 F.2d 499, 501–502 (9th Cir.1983). Because even a conclusory report by a treating physician presumably rests upon encapsulated experience with the subject, the ALJ may not reject or discount his or her summary report without first informing the claimant of this proposed action and providing the claimant an opportunity to submit a more detailed statement. *Echevarria v. Secretary of HHS, supra*, 685 F.2d at 756.

Appropriate reports of consultative physicians may constitute substantial, contradictory evidence, *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir.1983) (*per curiam*), but whether they do so in any specific instance depends upon the thoroughness of the underlying medical examination itself and the degree of light it sheds on the conflicting assessment of the treating physician. *See Bluvband v. Heckler, supra*, 730 F.2d at 893. While the ALJ may rely, in part, on his or her personal observations of the claimant during the hearing to assess a claimant's credibility on

certain allegations, the ALJ must nonetheless reach an independent judgment in light of *all* the relevant evidence. Under no circumstances may the ALJ arbitrarily substitute his or her own inferential judgment for a competent medical opinion, particularly where the ALJ's judgment assumes some degree of medical expertise and would amount to rendering an expert medical opinion which is based on competence he or she does not possess. *McBrayer v. Secretary of HHS*, 712 F.2d 795, 799 (2d Cir.1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 113 (2d Cir.1981). Cf. *Ferraris v. Heckler*, 728 F.2d 582, 586 n. 1 (2d Cir. 1984) (ALJ's observations along with other competent medical opinions rebutted conclusions of treating physician). Likewise, the ALJ may not unduly emphasize claimant's account of daily activities to rebut a physician's conclusions *Aubeuf v. Schweiker, supra*, 649 F.2d at 113–14.

a. Psychiatric Disorders.

As noted previously, Dr. Locuratolo reported that Ceballos experienced anxiety, severe depression, confusion and borderline psychosis with accompanying primary auditory hallucinations. The Secretary's consultative physician Luis Zeiguer corroborated Locurutolo's diagnosis with his own that Ceballos experienced "Major Depression, Apparently Preceded by Periods of Panic Attacks with Agaraphobia." (Tr. 86). Dr. Jaime Titievsky, a second consultative psychiatrist, diagnosed a moderate depressive neurosis and prescribed more intensive psychotherapy. (Tr. 100). Despite these consultative reports that buttressed Dr. Locuratolo's diagnosis, the ALJ proceeded to reach a conclusion at variance with those reports

> [I]t cannot be found that claimant is suffering from agaraphobia to the extent that she would be unable to travel to a job.... It is highly unlikely that an individual would maintain her appearance as does the claimant in the face of major depression. The claimant did not demonstrate any signs of depression during the hearing ... The undersigned

noted earlier that the claimant's demeanor was one of exaggeration.
(Tr. 11).

■ In reaching his conclusion, ALJ Liberman first ignored the treating physician rule.[5] In light of Dr. Locuratolo's reports, this Court could uphold the Secretary only by finding contradictory evidence substantial enough to rebut Locurotolo's conclusions. The Court, however, can find scarcely any contrary evidence, much less sufficient evidence to rebut the report of a treating physician. The reports of both consultative psychiatric examinations agreed with that of Dr. Locuratolo in diagnosing moderate to severe depression, neurosis, and agaraphobia. Neither of the consultative reports contained any finding at all on Ceballos' ability to hold a job. Dr. Titievsky even suggested more intensive treatment and opined only that Ceballos was competent to manage her own funds. There is, quite simply, no substantial medical evidence to support the ALJ's conclusion that Ceballos was not severely depressed and that she could hold a job.

■ Second, the ALJ improperly discredited Dr. Locuratolo's two reports on Ceballos' condition for his "failure to completely and clearly delineate the scope of the claimant's impairment ... [and because] Dr. Locuratolo has provided only vague indications of symptoms and has not clearly indicated the effect of these symptoms on the claimant's ability to function." (Tr. 10). Although the reports were admittedly conclusory, the ALJ nonetheless could not reject Dr. Locuratolo's assessments without informing Ceballos that he intended to discredit them and permitting her the opportunity to obtain a more detailed statement. The presence of a United Welfare League representative in no way obviated this responsibility. Considering the lack of any substantial contradictory evidence on this record, the ALJ could, at most, have asked Ceballos to submit a more complete statement from Locuratolo on how her depression affected her ability to hold a job or have ordered another examination, at the Secretary's expense, to make that determination.

■ Another error concerns the ALJ's blatant and shocking inclination to rely on limited personal observation, intuition, and selective interpretation of consultative reports in order to substitute his assessment and opinion of Ceballos after the hearing for the observations of the Secretary's consultative physicians and Ceballos' treating physician. An ALJ may rely on his personal observations to assess credibility on matters within common personal experience or to help inform an independent judgment in circumstances where the relevant medical evidence conflicts. Here the relevant medical evidence simply did not conflict. All of the doctors who saw her agreed that Ceballos suffered from moderate to severe depression, neurosis, and seeming agaraphobia. In light of that, the ALJ had no reason to substitute his perception of Ceballos' mental condition for that of Dr. Locuratolo. The ALJ compounded his error by relying on his limited personal observations and various accounts of Ceballo's daily activities to reach the conclusion that the diagnosed depression would not prevent Ceballos from holding a job. Neither of the consultative psychiatrists expressed an opinion on this point. In the absence of any contradictory evidence, Dr. Locuratolo's opinion that Ceballos could not hold a job was binding on the Secretary. The ALJ could either have requested a more specific explanation from Dr. Locuratolo or referred Ceballos to another consultative exam, but he most emphatically was not

5. This case then joins the list of "numerous" others within this circuit that have been reversed on the treating physician rule. In *Schisler v. Heckler, supra,* 787 F.2d at 84–85, the Second Circuit sought to stem this tide of needless relitigation by approving the use of an order to be fashioned by the district court that the SSA state explicitly in relevant publications that adjudicators are to apply the treating physician rule. *See also Stieberger v. Bowen,* 801 F.2d 29 (2d Cir.1986) (vacating injunction concerning treating physician rule on the basis that relief ordered in *Schisler* had removed justification for the more far-reaching relief ordered by the district court).

permitted to substitute his assessment of the severity of Ceballos' psychiatric problems and the further conclusion as to whether that condition would prohibit her gainful employment for the opinion of an expert treating physician. For all these reasons, the Court reverses the ALJ's decision on this point.

### b. Physical Disorders.

In addition to her psychiatric disorders, Ceballos alleged that she had several physical afflictions, including a heart disorder, hernia, lower back pain, arthritis and a thyroid condition. In his opinion, the ALJ noted that because Dr. Locuratolo "provide[d] absolutely no objective findings to support these conditions,

> there is, therefore, simply no evidence of any meaningful physical impairment, i.e., an impairment which would significantly limit the claimant's ability to engage in basic work activities. There is no evidence of a heart condition, no objective evidence of a hernia, none of arthritis and no showing that the claimant's thyroid, causes any of the difficulties alleged by the claimant.

(Tr. 10). Consequently, the ALJ essentially disregarded Ceballos' complaints of physical ailments in finding her not disabled.

### (i) Heart Condition.

 The ALJ's contentions notwithstanding, the record is replete with suggestions that Ceballos indeed suffers from some form of heart condition. Ceballos had been hospitalized in 1980 and 1983 for her heart. Dr. David Strassberg noted in his history that Ceballos had a three year history of heart disease and that exertion seemed to trigger chest pain three to four times a week which she took nitroglycerin to relieve. (Tr. 78). His impression was that she experienced her "[c]hest pain possibly secondary to atherosclerotic [sic] heart disease. (Tr. 81). Dr. Quereshy reached a similar conclusion of atypical chest pain. (Tr. 103). Dr. Peter Strassberg administered a treadmill stress test which had to be discontinued after five minutes once Ceballos began to complain of dypsnea.[6] It therefore cannot be said that there is no evidence of a meaningful heart impairment. The failure to acknowledge relevant evidence or to explain its implicit rejection is plain error. *Valente v. Secretary of HHS*, 733 F.2d 1037, 1045 (2d Cir. 1984). On remand the Secretary shall consider specifically the evidence of a heart condition and identify particularly which subsidiary findings support any conclusion as to whether her heart significantly limits Ceballos' ability to exert herself.

### (ii) Hernia and Lower Back Pain.

The ALJ dismissed any limitation Ceballos claimed on the basis of hernia and lower back pain with the statement that there was no objective evidence of a discal hernia. In the first place, Ceballos need only show that she suffers symptoms, here the lower back pain, that can be shown to result from a medical impairment, in this instance the herniated disc.[7] She did that clearly in an exchange with the ALJ.

Q. Well why can't you work.

A. Because I'm ill. I'm ill at mind. Nerves. My discs and my thyroid.

Q. Your discs you mean your back.

A. Yes.

Q. Alright tell me about your back.

A. I have a herniated disc.

Q. You have a herniated disc.

---

6. The Secretary uses the results of treadmill exercise testing as the primary basis for deciding disability when the claimant complains of cardiac chest pain precipitated by effort and promptly relieved by nitroglycerin. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 4.00 E–G, 4.04.

7. As amended by P.L. 98–460, section 223(d)(5) of the Act provides:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or symptoms alleged.

42 U.S.C. § 423(d)(5).

A. Yes.

Q. Have you been hospitalized for that condition.

A. I am undergoing treatment. And the doctors says no operation can be made. Because he cannot guarantee the results.

Q. Who is treating you.

A. I am being treated by the doctor—Dr. Locuratolo, who has recommended that I go to the hospital. For further tests. When I went there, xrays were done. And they told me that no results—no guarantees could be given, after the results of the operation.

Q. What hospital and when.

A. Jewish Center. North Center. About a month ago at North Center.

Q. Mr. Daniel are you aware of this. Representative I didn't know about this.

ALJ. Well I suggest you—

Representative That is why I didn't have it.

ALJ. Alright well I think you should make a note of the fact—that we don't have any hospital record for that. Also, I find it—you are aware Ms. Ceballos that Dr. Locuratolo never mentioned anything about a herniated disc in his reports.

A. I don't know.[8]

■■■ The brief exchange on this topic, one to which he never returned, should have apprised the ALJ of the connection between her symptom of lower back pain and the condition, a herniated disc. Had this colloquy been the total of the record, the ALJ would have been free to consider whether, in light of the lack of objective evidence to support the severity of the symptoms Ceballos claimed, he should discount her testimony on the basis of inconsistencies in the evidence as a whole. *See, e.g., Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984). He could not do so on the basis of his personal observations alone. Just as he could not dismiss automatically Ceballos' claimed symptoms, nei-

ther could the ALJ simply disregard Dr. Locuratolo's diagnosis. There is no requirement that the treating physician who corroborates a claimant's symptoms support his opinion with objective clinical or laboratory findings. *Bluvband v. Heckler, supra,* 730 F.2d at 893.

Moreover, the record in this case contains just the sort of objective physical evidence required to support Ceballos' assertions. Dr. Carmona, who took an x-ray of Ceballos' lumbosacral spine at Dr. Locuratolo's request, and Dr. Rabiner, who took an x-ray as part of a consultative exam, (Tr. 82), both diagnosed chronic discogenic disease. (Tr. 133). Dr. David Strassberg noted the decreased range of motion in Ceballos' spine and that she experienced associated pain on motion. (Tr. 80). In the absence of specific and substantial contradictory evidence, the ALJ was obligated to consider the impact of this limitation on Ceballos' capacity to engage in substantial gainful activity. On remand, he shall do so.

(iii) Thyroid Condition.

■■■ Dr. Rubin, who had treated Ceballos following her thyroidectomy, noted that she had responded well to medication following her surgery. The ALJ's conclusion that her past thyroidectomy and present medication did not impair her ability to hold a job, therefore, is supported by substantial evidence.

(iv) Arthritis and Bronchitis.

■■■ Although the ALJ claimed once again that the record contained no evidence of arthritis, the transcript belies the statement. Ceballos listed it as one of her impairments when she applied for disability benefits. (Tr. 38). Dr. Locuratolo listed it as one of her ailments, (Tr. 77, 134), as did Dr. David Strassberg, (Tr. 78, 81), in the report of his consultative examination. In the face of these diagnoses, the Court can-

---

8. Dr. Locuratolo in fact did mention the herniated disc in both the June 23, 1983 and May 22, 1984 letters to the SSA. (Tr. 77,134).

not either accept a finding that Ceballos did not have arthritis or assume that it would not interfere with her ability to hold a job. The Court would note that the consultative reports of Dr. Strassberg diagnosed bronchitis, (Tr. 78), and that in his second report Dr. Locuratolo noted that Ceballos suffered from anemia and dizzy spells. (Tr. 134). Although Ceballos did not apply for benefits specifically on the basis of these conditions, on remand and in fulfilling his duty conscientiously to develop the record the Secretary shall consider the effect, if any, these additional afflications might have on Ceballos' ability to hold a job.

To summarize, the Court upholds the ALJ's finding on Ceballos' thyroid condition, but reverses the findings on her heart condition, hernia, lower back pain and arthritis as unsupported by substantial evidence.

### B. Vocational Evidence

As noted above, once the disability evaluation process reaches the fifth step, the burden shifts to the secretary to prove that the claimant has the residual capacity to perform alternative occupations available in the national economy. *Graham v. Heckler*, 580 F.Supp. 1238, 1240 (S.D.N.Y.1984). Although on remand the Secretary will have to redetermine the fifth step of the analysis in light of the Court's opinion the ALJ's cavalier treatment of that step in the determination requires comment.

The Secretary's own regulations direct that he consider the factors, physical ability, age, education and work experience, that Congress has identified as relevant. *See* 42 U.S.C. 423(d)(2)(A); 20 C.F.R. 404.-1520(f); *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Rules of 20 C.F.R. 404, Appendix 2, commonly referred to as the "grid," provide uniform guidelines to inform the decision of whether jobs appropriate for the individual claimant exist in the national economy.

The [regulations] consist of a matrix of the four factors identified by Congress—physical ability, age, education and work experience—and set forth rules that iden-

tify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Heckler v. Campbell*, 461 U.S. 458, 461–62, 103 S.Ct. 1952, 1954–55, 76 L.Ed.2d 66 (1983). While the Supreme Court has specifically upheld use of the grid so that the Secretary need not litigate the existence of specific jobs at each hearing, the Court noted that the Secretary's own regulations acknowledge the limited circumstances in which it is appropriate to apply the grid. *Campbell v. Heckler, supra*, 461 U.S. at 462 n. 5, 103 S.Ct. at 1955 n. 5; *see* 20 C.F.R. 404, subpt. P, App. 2, § 200.-00(a)(d)(e); 20 C.F.R. § 404.1563(a). The Secretary may apply the grid only when the rules accurately describe a claimant's abilities and limitations. When a claimant has presented both strength and nonexertional limitations, the Secretary may use the grid only as a "framework" for his analysis and cannot rely upon the grid as the sole basis for a conclusion that suitable jobs exist in the economy. 20 C.F.R. § 404 subpt. P, App. 2, § 200.00(e)(2); *see Graham v. Heckler*, 580 F.Supp. 1238, 1241 (S.D.N.Y.1984). In those instances, where a claimant's combination of impairments cannot be matched with a square on the grid, the Secretary must give "full consideration ... to all the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor." 20 C.F.R. § 404 subpt. P, App. 2 § 200.00(e)(2).

ALJ Liberman clearly failed to meet the standard of review detailed in these regulations when he assessed Ceballos.

The claimant is 47 years old, defined as a younger individual. She has the equiva-

lent of a high school education and is able to communicate in Spanish. She has no transferable skills. Looking to the medical vocational guidelines set forth in Subpart P, Regulations No. 4 as a "framework," for decisionmaking, it is noted that Rule 204.00 provides a "framework" for considering the ability to work of an individual who has no physical impairment but retains the residual functional capacity on a non exertional basis for work activities. As this claimant has not demonstrated physical impairment, she retains the residual functional capacity for all ranges of exertional activity up to heavy work. Using Rule 204.00 as a framework for decisionmaking, it is found that the claimant has the capacity to make an occupational adjustment to many simple unskilled jobs existing in significant numbers in the national economy.

(Tr. 11). The passage from his opinion quoted above is the sole account the ALJ takes of the four factors Congress has directed the Secretary to consider in making the determination of disability. Although he intoned "framework," it is apparent to this Court that ALJ Liberman merely applied the grid reflexively. He made no specific findings concerning Ceballos' age, her education, which was in Spanish, or work experience as they applied to available jobs other than to state conclusively that she could make an occupational adjustment to many simple unskilled jobs. Indeed, the ALJ never made any direct finding at all. Rather, in "Finding" number nine he posed, and left dangling, two hypothetical statements: 1) if Ceballos' non-exertional ailments did not compromise her ability to do work, she would not be disabled; and 2) if her ailments did compromise her ability to work, her residual functional capacity *would be* considered along with her age, education and work experience. Under these circumstances, the ALJ's reliance on the grid, even if supposedly only as a "framework," when he failed to consider explicitly the effect of her non-exertional psychiatric impairment and in the absence of specific findings on the factors of age, education and work experience constitutes a reversible error of law.

## CONCLUSION

The Secretary's motion for judgment on the pleadings is denied. The Court remands the case to the Secretary to redetermine plaintiff's application in light of the new mental impairment guidelines and for such other proceedings, consistent with this opinion, as are necessary. Additionally, because of numerous errors of law and procedural flaws, the Court reverses and vacates the decision of the ALJ. On remand, the Secretary shall assign the case to another ALJ to determine the degree of plaintiff's diagnosed depression and agaraphobia and what impact that condition has on her ability to maintain substantial gainful employment. In the event the Secretary finds that Ceballos' mental condition does not preclude her employment, the Secretary shall make further specific and sustantial findings on each of the physical conditions plaintiff alleges in her disability application or that appear from the relevant medical evidence in the record. In making these findings, the Secretary shall accord the reports of Dr. Locuratolo, plaintiff's treating physician, the weight they are due under the treating physician rule. Finally, if the Secretary determines, after applying steps one through four of the severity regulations that plaintiff retains residual functional capacity to perform work, he shall take the appropriate vocational testimony on whether suitable jobs exist in the national economy. The instant action hereby is dismissed, subject to being reopened by either party within a reasonable time following proceedings by the Secretary.

It is so ordered.