**Lydia RIVERA, Plaintiff,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.**

**No. 86 Civ. 4122 (RLC).**

United States District Court, S.D. New York.

May 14, 1987.

David W. Weschler, The Legal Aid Soc., Community Law Offices, for plaintiff; Robert Jay Rohrberger, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Diogenes P. Kekatos, Sp. Asst. U.S. Atty., of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff Lydia Rivera brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final determination of the defendant Secretary of Health and Human Services ("the Secretary") denying plaintiff's application for Supplemental Security Income ("SSI") disability benefits. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c), F.R. Civ.P.

## BACKGROUND

Rivera was born on April 13, 1953. (Trial Transcript ["Tr."] at 24). She has a seventh-grade education (Tr. 62), and she was last employed, on an assembly line, between 1968 and 1970. (Tr. 66).

Rivera's claim arises from a March 21, 1983 automobile accident. After the accident, Rivera was hospitalized for four days, and then complaining of injuries from the accident, entered the hospital again from May 17 to May 31, 1983. The medical evidence consists of the records from those hospital stays, reports by the four doctors from whom Rivera has sought treatment, all of whom found the patient to be permanently disabled, and the report of the doctor who Rivera saw at the Secretary's request.

The doctor who has had the most contact with Rivera is Dr. Zwi Weinberg, an orthopedist. Dr. Weinberg first examined Rivera on May 16, 1983, when she came to him complaining of pain over the left hip and left knee, and of recurrent headaches, dizziness and insomnia. He found paravertical muscle spasms in the cervical and lumbar areas. (Tr. 73). A foraminal compression test, which tests cervical spinal nerve route inflammation, was positive in all three positions. *Id.* Her bilateral straight leg raise was limited to 45 degrees. Lateral binding of the lumbar spine (neck region) demonstrated a loss of 10 degrees in flexion, and manual rotation of the head caused pain. Pain was also elicited during movements of the left hip and knee. *Id.* Dr. Weinberg's diagnosis was a clinical manifestation of a cervical and lumbar disc lesion with secondary radiculopathy (a disease of the spinal nerve roots), posttraumatic paravertebral muscle spasms, and posttraumatic left hip and knee contusions. (Tr. 74). He concluded that Rivera had been disabled by the accident, and that "[d]ue to the poor response to medication, physiotherapy and spinal manipulation, her disability is deemed permanent." *Id.*

In a second, follow-up report dated November 19, 1985, Dr. Weinberg noted that Rivera continued to complain of severe pain in the cervical spine and lumbar spine, and continued to have difficulty walking. (Tr. 94). He observed severe spasms of the paravertical muscles of the cervical spine, and a continuing five degree loss of lateral tilt and flexion. He found Rivera's left leg raise was 40 degrees bilaterally. The doctor found no change in the neurological

examination, and noted that Rivera continued to complain of headaches. His diagnosis was posttraumatic internal derangement of the cervical and lumbosacral spine. Once again, he noted that the accident had disabled her, and that due to her poor response to medication, physiotherapy and manipulation, the disability was considered permanent. (Tr. 95).

Dr. Arthur Greenspan, a neurologist, also found Rivera permanently disabled. (Tr. 93). In his undated report, Dr. Greenspan noted that he first saw Rivera on May 16, 1983, at which time she complained of headaches, pain in the cervical and lower back areas, pain in the right shoulder, impaired mobility, loss of strength, weakness, malaise, insomnia, blurred vision and dizziness. (Tr. 91). Dr. Greenspan found that Rivera's cervical spine was straightened (Tr. 92), and that palpitation evoked pain over the paravertebral musculature in the right shoulder. He found the paravertebral muscles in the cervical spine in spasm, with range of motion only 75 percent normal. Similarly, he found the paravertebral musculature in the lumbosacral spine in spasm, and range of motion only 65 percent normal. He reported that Rivera could not walk on her heels or toes and could not squat without suffering lower back pain. The foraminal compression test was positive in all three positions tested. His diagnosis was posttraumatic headaches, insomnia, depression, vertigo, and posttraumatic clinical manifestation of cervical and lumbosacral disc lesions with secondary radiculopathy. He prescribed Motrin (for pain and arthritic symptoms), Tofranil (for depression), Librium (for anxiety disorders), psychotherapy and spinal manipulation. (Tr. 92). Like Dr. Weinberg, Dr. Greenspan concluded that Rivera had been disabled by the accident, and that due to her poor response to medication, physiotherapy and manipulation, her disability was permanent. (Tr. 93).

Rivera was also treated by Dr. Barry Pinchefsky, a chiropractor. Dr. Pinchefsky reported on November 17, 1985, that Rivera continued to complain of pain, tenderness, and stiffness in the neck and lower back. (Tr. 96). He too found diffuse paraspinal muscle spasms and restricted ranges of motion. Dr. Pinchefsky stated that specific spinal correction was temporarily relieving Rivera of some of the symptoms, but that long-term remission was improbable. As a result, he too concluded that Rivera was permanently disabled. (Tr. 96).

Rivera also was treated by Dr. Vincent Vasile, a physiotherapist. In a report dated November 17, 1985, Dr. Vasile confirmed the other doctors' opinions, finding "post traumatic of [sic] left leg with recurrent muscular spasms." He stated that Rivera reacted poorly to the physical therapy she was undergoing, and that he deemed her disability to be permanent. (Tr. 97).

As is customary, Rivera was also examined by the Secretary's consulting physician, Dr. Caleb Medley of Diagnostic Health Services, Inc. Dr. Medley found that Rivera could walk on her toes and heels with a normal gait. She could flex her spine ninety degrees, and was able to squat, though only partially, and rise from that position. Dr. Medley found that she had no trouble getting on or off the examination table or arising from a supine position. (Tr. 84).

In a sitting position plaintiff was able to fully extend both knees to zero degrees (*Id.*). In the supine position Medley reported that Rivera was able to perform straight leg raising to a full 90 degrees bilaterally. There were no motor, sensory or reflex deficits in the lower extremities, and the hips, knees, and ankles demonstrated normal ranges of motion. Dr. Medley observed no atrophy of the calf muscles. *Id.*

Examination of the upper extremities showed full ranges of motion with no neurological deficits. *Id.* Forward flexion, backward extension and lateral bending of the cervical spine were performed to 30 degrees. Rotation of the cervical spine was performed to 35 degrees, with plaintiff experiencing pain upon rotation to the left. X-rays of the cervical spine showed partial straightening of the cervical spine and elongation of the transverse process bilaterally at the C7 vertebra. The disc inters-

paces, however, were intact. (Tr. 85). Dr. Medley diagnosed cervical strain and post-traumatic coccydynia (pain in the tail bone or coccyx area). *Id.*

The remaining medical evidence consists of the records from North General Hospital in New York, New York. Physical examinations there found pain and paravertebral muscle spasm, but no neurological deficits. (Tr. 75–81). X-rays showed mild scoliosis of the lumbar spine and very mild compensatory scoliosis of the thoracic spine. (Tr. 82). The diagnosis was cervical and lumbar spine sprain. (Tr. 75). Treatment consisted of traction, bedrest, medication and physical therapy. (*See* Tr. 75–76, 78, 94). By the time of her discharge, plaintiff's muscle spasms had partially subsided. (Tr. 75).

At a hearing before Administrative Law Judge Wallace Tannenbaum ("the ALJ") on September 20, 1985, Rivera testified that she suffers from constant pain in her neck and back which makes her unable to turn her neck and gives her pain when she attempts to bend down. She testified that she can only stand for 15 to 20 minutes without resting. (Tr. 33). Although she cares for her children and her mother, and does some housework, she testified that she can do only an hour of housework before resting, and must take a nap every day. (Tr. 33–34). Approximately twice a day her pain is so intense that she must lie down until it subsides. (Tr. 36–37). In addition, she testified that she experiences headaches three or four times a week so severe that pills she has been prescribed do nothing to alleviate her pain and she is unable to do any housework. (Tr. 34–35). To get by, she relies on her sister, who regularly helps with the housework and helps care for their mother. Her ex-husband helps her by carrying heavy packages from the store. (Tr. 36).

In a December 2, 1985, opinion the ALJ found that although Rivera's injury "might have been 'disabling' for a brief period of time after her accident, the medical evidence shows a clear improvement." (Tr. 14). He denied her application for disability benefits, finding her capable of performing "light work." (Tr. 14). *See* 20 C.F.R. § 416.967(b).[1] The Appeals Council denied plaintiff's request for review on March 21, 1986, making the ALJ's decision the final decision of the Secretary in this matter. (Tr. 2–5).

## DISCUSSION

To determine whether a claimant is disabled, the Secretary must consider objective medical facts, diagnoses and medical opinions based on those facts, subjective evidence of pain and disability testified to by the claimant and other witnesses, as well as the claimant's educational background, age, and work experience. *Bluvband v. Heckler,* 730 F.2d 886, 890 (2d Cir.1984); *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). The Secretary operates as fact-finder, and it is his responsibility to resolve all evidentiary conflicts. *Id.*

With respect to medical evidence, however, two important rules govern the Secretary's fact-finding function. The Secretary must render a decision on the basis "of *all* the relevant evidence." *Ceballos v. Bowen,* 649 F.Supp. 693, 700 (S.D.N.Y.1986) (Ward, J.) (emphasis in original); *see also* 42 U.S.C. §§ 423(d)(5)(B),[2] 1382c(a)(5).[3]

---

1. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting

factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 416.967(b).

2. That section provides:
In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Secretary shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making

3. See note 3 on page 205.

Thus, although the ALJ is not required "explicitly to reconcile every conflicting shred of medical testimony," *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981), he cannot pick and choose evidence that supports a particular conclusion. *Ceballos, supra,* 649 F.Supp. at 700; *Fiorello v. Heckler,* 725 F.2d 174, 175–76 (2d Cir.1983). His "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Ceballos, supra,* 649 F.Supp. at 702 (citing *Valente v. Secretary of Health & Human Services,* 733 F.2d 1037, 1045 (2d Cir.1984)); *see also Andino v. Bowen,* No. 84 Civ. 8226, slip op. at 7 (S.D.N.Y. March 12, 1987) (Carter, J.).

In evaluating the evidence, it is especially important that the Secretary give extra weight to the opinion of the claimant's treating physicians. Because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, his opinion on the question of disability is entitled to more weight than that of non-treating physicians, and is binding on the Secretary unless contradicted by substantial evidence. *Schisler v. Heckler,* 787 F.2d 76, 81 (2d Cir.1986); *Bluvband, supra,* 730 F.2d at 893.

The Secretary's failure to follow the treating physician rule is, of course, infamous. *See, e.g., De Leon v. Heckler,* 734 F.2d 930, 937 (2d Cir.1984) (cases reversing Secretary on treating physician rule are "almost legion"). Less renowned, but certainly not unheard of, are cases like the instant one, where the Secretary not only fails to give proper weight to the opinions of treating physicians, but gives those opinions no weight at all. *See Andino, supra,* slip op. at 7; *Ceballos, supra,* 649 F.Supp. at 702.

In his written opinion, the only reference the ALJ made to the reports submitted by the four doctors from whom Rivera had sought treatment consists of a two sentence recitation of Dr. Weinberg's initial report.[4] Not only did the ALJ fail to indicate that Dr. Weinberg's opinion is to be accorded some extra weight, *see Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987), but he did not even mention Dr. Weinberg's second, follow-up report, or the reports of Drs. Greenspan, Pinchefsky and Vasile. *See Andino, supra,* slip op. at 7. The absence of these reports from the ALJ's opinion is especially suspicious in light of the fact that, by arrangement, those reports were made a part of the record after the hearing. (*See* Tr. 1, 23).

The Secretary now tries, without success, to justify the absence of these reports from the ALJ's opinion. He explains the omission of Dr. Weinberg's second report and Dr. Greenspan's report essentially on the ground that those reports merely duplicated information available in Dr. Weinberg's first report and aptly summarized by the ALJ. Defendant's Memorandum at 19–20. The fact that these reports accord with Dr. Weinberg's initial diagnoses and his conclusion that Rivera is permanently disabled hardly renders them irrelevant: The conclusion in Dr. Weinberg's second report reflects a continuing opinion regarding her disability. The conclusions in Dr. Greenspan's report reflect not only the corroborating opinion of a second treating doc-

---

any determination the Secretary shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.
42 U.S.C. § 423(d)(5)(B).

**3.** That section provides, in part:
Any determination under this paragraph shall be made on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition which is presented

by the individual or secured by the Secretary. Any determination made under this paragraph shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition....
42 U.S.C. § 1382c(a)(5).

**4.** Noting that Rivera had been in the car accident on March 21, 1983, the ALJ wrote:
Examinations at that time revealed diffuse paravertebral muscle spasms, limitation of motion and a positive straight leg raising test bilaterally. At that time, the examining physician indicated that the claimant's condition was permanent and disabling.
(Tr. 14).

tor, but corroboration by a doctor of a different specialty. (Dr. Weinberg is an orthopedist; Dr. Greenspan is a neurologist). This is important information that should have been an integral part of the ALJ's decision. *See Fiorello, supra,* 725 F.2d at 176.

The Secretary tries to dismiss the opinions of Drs. Pinchefsky and Vasile on the ground that as a chiropractor and physiotherapist, respectively, they cannot be considered treating physicians under the governing regulations. Courts are split on whether the opinions of a chiropractor or a physical therapist may be accorded the weight of a "treating physician." *Compare MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir.1986) (referring to chiropractor as treating physician); *Frey v. Bowen,* 816 F.2d 508 (10th Cir.1987) (same); *Dorsey v. Heckler,* 702 F.2d 597, 603 (5th Cir. 1983) (same), *with Vasquez v. Secretary of Health & Human Services,* 632 F.Supp. 1560, 1565 (S.D.N.Y.1986) (Conner, J.) (chiropractor is not a treating physician); *Rivera v. Heckler,* 598 F.Supp. 203, 206–07 (E.D.Pa.1984) (same).[5] In this case, however, it is unnecessary to decide which line of cases is more persuasive. All courts agree that the opinion of a treating chiropractor or a physical therapist must be accorded *some* weight, and here those opinions were accorded none. *See Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) (opinion of treating nurse practitioner "is entitled to some extra consideration"); *Vasquez, supra,* 632 F.Supp. at 1565. The ALJ's failure to take those opinions into account was reversible error.

As a result, the case is remanded to the Secretary for a resolution consistent with this opinion. It will not be sufficient if on remand the Secretary merely includes references to the omitted reports in another decision denying benefits. If the ALJ disagrees with the opinions of the treating physicians, he must set forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Ferraris v. Heckler,* 728 F.2d 582, 587–88 (2d Cir.1984); *Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir.1983); *Ceballos, supra,* 649 F.Supp. at 700. Nothing less will be tolerated.

IT IS SO ORDERED.

---

**5.** The argument that a chiropractor or physical therapist cannot be a treating physician is based on provisions in the regulations which list "[A]cceptable medical sources" of evidence of disability as:

    (1) Licensed physicians;
    (2) Licensed osteopaths;
    (3) Licensed or certified psychologists;
    (4) Licensed optometrists for the measurement of visual acuity and visual fields (see pararaph (f) of this section for the evidence needed for statutory blindness); and
    (5) Persons authorized to send us a copy or summary of the medical records of a hospital, clinic, sanitorium, medical institution, or health care facility. Generally, the copy or summary should be certified as accurate by the custodian or by any authorized employee of the Social Security Administration, Veteran's Administration or State agency. However, we will not return an uncertified copy or summary for certification unless there is some question about the document.

20 C.F.R. § 416.913(a). *See, e.g., Vasquez v. Secretary of Health and Human Services,* 632 F.Supp. 1560, 1565 (S.D.N.Y.1986) (Conner, J.).