**Dolores RIVERA, Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., in his Official Capacity as Secretary of Health and Human Services, Defendant.**

**No. 90 Civ. 5320 (RPP).**

United States District Court,
S.D. New York.

July 17, 1991.

**1342**

David Stroh Buckel, New York Law School, Federal Litigation Clinic, New York City, for plaintiff.

Susan D. Baird, Sp. Asst. U.S. Atty., S.D.N.Y., New York City, for defendant.

## ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This Court has received and reviewed the Report and Recommendation (the "Report") issued by Magistrate Judge Michael H. Dolinger on June 25, 1991 in the above-captioned action. No timely objections to the Report have been made by the parties to this petition. The Court has considered the Report and agrees with its recommendations. Accordingly, it is hereby

ORDERED that the Report and Recommendation issued by Magistrate Dolinger on June 25, 1991 is accepted in accordance with 28 U.S.C. § 636(b). Accordingly, it is further

ORDERED that plaintiff's motion for judgment on the pleadings is granted, that defendant's motion for judgment on the pleadings is denied, and that the case is remanded to the Secretary solely to calculate benefits.

## REPORT AND RECOMMENDATION

MICHAEL H. DOLINGER, United States Magistrate Judge.

Plaintiff Dolores Rivera seeks review of the decision of the Secretary of Health and Human Services denying her application for Supplemental Security Income ("SSI") benefits. Plaintiff originally applied for benefits on September 27, 1984, claiming that she was disabled due to the effects of rheumatic heart disease, seizures and epilepsy. (Tr. 26–27.)[1] In subsequent filings and in her testimony, plaintiff also referred to left side weakness and numbness in her left hand resulting from an August 1984 stroke, back pain, chest pain, right leg pain, heart problems, and dizziness from her various medications. (*E.g.*, Tr. 52, 61, 62, 257, 259, 261.) After an initial remand from this court to the Secretary for further administrative findings, plaintiff seeks review of the Secretary's second denial of her application. Both parties have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons that follow, I recommend that plaintiff's motion be granted, that defendant's motion be denied, and that the case be remanded to the Secretary solely for the calculation of benefits.

### Prior Proceedings

Plaintiff's application was denied initially (Tr. 36–37) and on reconsideration. (Tr. 40.) Plaintiff thereafter requested and received an evidentiary hearing before Administrative Law Judge ("ALJ") Irwin Bernstein on September 5, 1985, at which she appeared *pro se*. The ALJ issued a decision on September 25, 1985 denying plaintiff's application for SSI benefits, since he found that she could perform her past relevant work as a "floor girl" in a towel factory. (Tr. 14.) Plaintiff appealed this decision to the Appeals Council and submitted additional medical evidence in support of her application. Notwithstanding her additional evidentiary submission, the Appeals Council affirmed the decision of the ALJ on March 24, 1986. (Tr. 4–5.)

On June 23, 1986, plaintiff filed a *pro se* suit challenging the Secretary's decision. *Rivera v. Bowen*, 86 Civ. 4928 (PKL). On February 5, 1988 I issued a Report and Recommendation urging a remand to the Secretary for clarification and supplementation of the record. The court adopted the Report and remanded the case to the Secretary for further administrative proceedings. (*See* Order dated May 24, 1988.)

Following the remand, a second hearing was conducted by ALJ Roy P. Liberman. At the first session of the hearing, on January 25, 1989, Ms. Rivera testified with counsel present. The second session of the hearing was conducted on March 30, 1989.

---

1. The designation "(Tr. #)" refers to the transcript of the administrative record. Pages 1–212 comprise the original administrative record certified July 28, 1986, while pages 213–428 comprise the supplemental record on remand certified October 10, 1990.

At that proceeding Ms. Rivera's daughter Carmen testified, together with a medical expert, Dr. Richard Wagman, and a vocational expert, Dr. Patricia Dvonch. On July 20, 1989, the ALJ issued his recommended findings to the Appeals Council, concluding that Ms. Rivera was not disabled because she was capable of performing her past relevant work as a "factory floor girl." (Tr. 225–26.) On May 15, 1990, believing that Ms. Rivera had filed no objections, the Appeals Council adopted the ALJ's recommended findings and conclusions. (Tr. 216.) After resubmission of plaintiff's objections, which apparently had been misplaced by the Secretary, the Appeals Council issued a final decision on June 19, 1990 that reviewed Ms. Rivera's objections at length, but still adopted the ALJ's recommended findings in their entirety. (Tr. 420–25.)

Plaintiff commenced this action to set aside the Secretary's denial of benefits on August 15, 1990.

### The Evidence of Record

#### 1. Plaintiff's Testimony

Ms. Rivera was born in Puerto Rico on February 10, 1940. She was therefore forty-four years and seven months old at the time of her application. Although she is a high school graduate, she speaks no English and can understand only a little. (Tr. 19, 20, 247.) Plaintiff held several different jobs between 1970 and 1981, the details of which she could not recall (Tr. 55), except for her brief sojourn in a plastics factory. At that job, "I would be where the plastic things were coming out of a machine, and I would take them from where they are and put them into what they call a basket." (Tr. 248.) That job involved light lifting and an undetermined amount of standing and sitting. (Tr. 248–49.)

Plaintiff held her last job from 1981 to 1982, working as a "floor girl" in a towel factory. (Tr. 247.) In describing her responsibilities as a "floor girl," plaintiff testified:

> They sometimes give me the towels to put on the prices, to check them out to

see whether there was any kind of defect, to take out the towel. This is what I understand. Put some kind of a mark on a little ribbon that went on the towel. (Tr. 247.) Although plaintiff's testimony was not a model of clarity, she appeared to describe at least three functions that she performed at the towel factory. First, she was required to use a staple gun to put price tags on the towels. To do so, she held the staple gun in her right hand and held the towel and a price tag in her left hand. Apparently, she then aligned the price tag in the proper place and stapled it to the towel. Second, plaintiff was required to use a ruler to check whether all of the markings on the towel were straight and in accordance with the towel design. Finally, after undertaking these tasks, plaintiff folded the towel and placed it in a plastic bag. (Tr. 56, 248, 262.)

In her original disability application, plaintiff—obviously in error—described her job as involving six hours of walking, eight hours of standing and six hours of sitting. (Tr. 52.) In a vocational report filed in June 1985, however, she clarified the physical requirements of her former job, stating that it required two hours of walking, four hours of standing, and two hours of sitting. (Tr. 56.) Finally, at the hearing Ms. Rivera indicated that she could perform the various tasks required of her at her job either standing or sitting, although "sometimes I had to stand because I had to walk, but not too far, just near the table where I was working." (Tr. 248.) Plaintiff also testified that her job involved frequent bending, although it did not require any lifting and carrying. (Tr. 86, 248.)

Plaintiff testified that she had stopped working in 1982 when she began having epileptic seizures. (Tr. 249.) She stated at the hearing that her last seizure had been in 1988, and that she takes phenobarbital to control this condition. (Tr. 249–50.)

On August 19, 1984, plaintiff was admitted to St. Barnabas Hospital with a diagnosis of a cerebrovascular accident, commonly known as a stroke. (Tr. 150–51, 249.) Plaintiff testified that as a result of the stroke, she has had recurring problems

with her left side and her non-dominant left hand. In particular, plaintiff claimed that she could not grab or hold onto any objects with her left hand because of a lack of sensation in the hand. (Tr. 249, 252.)

Plaintiff also testified regarding a number of additional physical ailments and limitations. First, she claimed that she could stand for only one hour at most, and that she suffers from a painful swelling in her right ankle if she stands for too long. (Tr. 250, 263.) At the initial hearing, plaintiff had testified that she could sit for only half an hour continuously, and that she was not able to kneel or bend at all. (Tr. 21.) At the second hearing, however, she indicated merely that she would not be able to sit for four hours out of an eight hour day. (Tr. 264.) Plaintiff also stated that she could walk only about four blocks at a time, that she must walk slowly and stop frequently, and that sitting in a certain type of chair or in a certain position is painful. (Tr. 251–52, 259.) In addition, plaintiff testified that she suffers from pains on the left side of her chest about twice a month, and has had pain in the middle of her chest two or three times. (Tr. 257–58.) Plaintiff also claimed that she is easily fatigued and has recently been suffering more serious and frequent back pain, and that she takes Lanoxin for a heart valve "that doesn't work right." (Tr. 259, 261.)

Plaintiff further testified that she is unable to use stairs because of her physical limitations. She claimed that as a result, she cannot use public transportation and always gets a ride or takes a taxi whenever she goes out of her apartment. (Tr. 246.) She spends her time reading, watching television and observing street life from her window. (Tr. 22, 24, 276.) Sometimes she has trouble dressing because of her inability to use her left hand. Since she cannot button the right sleeve of her shirts, she generally wears either pull-on or zippered clothes. (Tr. 23, 255, 277.) Her son and daughter currently live with her and have done her housework and have taken care of her since she suffered her stroke in 1984. (Tr. 24, 254–55.)

### 2. *Plaintiff's Daughter's Testimony*

Carmen Rivera testified that she had lived with her mother since the end of 1987. (Tr. 275–76.) She stated that she generally does the shopping and laundry for her mother, while her brother does the house cleaning. (Tr. 277–78.) She further claimed that she and her brother do all the cooking for their mother, although plaintiff testified that she does occasional light cooking on her own. (Tr. 255, 277.) Carmen described her mother's complaints of headaches, back pain, tightness in the chest, chest pain, leg pain and loss of balance. To her knowledge, her mother had had a number of seizures in 1986, 1987, and 1988, three of which she had witnessed. (Tr. 279.) She stated that since her mother could not use the stairs, if the elevator in her building was not working she could not leave her apartment. (Tr. 280.) Carmen testified that plaintiff occasionally visits her neighbor's home, but friends residing further away must come and pick her up at her apartment. (*Id.*)

### 3. *The Medical Evidence*

The record contains a number of medical files and reports from both treating and non-treating physicians. The earliest entry in plaintiff's medical file, dating from 1967, is from the Dr. Martin Luther King, Jr. Health Center, and reflects a history of acute rheumatic fever. (Tr. 69.) No other serious problems are described in her medical file until October 1977, when it is noted that she suffered from moderately severe mitral stenosis, or the narrowing of a ventricular valve. (Tr. 92.) In 1982, plaintiff experienced her first epileptic seizure, and then in August 1984 she was hospitalized for a stroke, with signs of left hemiparesis and slurred speech. A CT scan revealed a "large area of recent infarction of right mid and posterior parietal lobes with mass effect." (Tr. 150.) Her discharge diagnosis stated "rheumatic heart disease with mitral stenosis, episode of cardiac arrhythmia, CVA, right, seizure disorder." (Tr. 151.)

Dr. Malcolm Phillips, plaintiff's physician at the Dr. Martin Luther King, Jr. Health

Center, prepared a residual functional capacity ("RFC") report dated September 9, 1984, approximately one week after plaintiff had been discharged from the hospital. Dr. Phillips stated that plaintiff could stand for only "short periods," but could sit or alternately sit and stand without limitation. He estimated that she could walk without stopping for only one to two blocks, could lift and carry "up to 10 lbs.," but could not use the subway, apparently because she could not climb the stairs. (Tr. 153–54.) He further noted that plaintiff's "left-sided weakness" limited her ability to use her hands for "grasping, pushing, pulling, or doing fine manipulations ..." and caused problems with "bending, squatting, kneeling or turning parts of [her] body." (Tr. 154–55.)

Dr. Phillips reassessed plaintiff's residual functional capacity in January 1989 without having reexamined plaintiff since preparing his original report. He stated that plaintiff's mitral stenosis caused shortness of breath, an inability to climb stairs and marked intolerance to exercise, and that plaintiff's stroke had left her incapable of using her hands, squatting, bending or turning. (Tr. 370.) He concluded that unless plaintiff's condition had improved since he had last seen her, she was disabled and unable to work an eight-hour day. (Tr. 375.)

Dr. Gerald Smarth, plaintiff's regular treating physician, prepared his first RFC report on plaintiff in September 1984, with results comparable to those of Dr. Phillips. Dr. Smarth also gave a "fair" prognosis to plaintiff and reported that her impairment would last for at least a year. He indicated that plaintiff could stand for up to one hour and could sit and alternately sit and stand without limitation. Like Dr. Phillips, he estimated that plaintiff could walk for only one to two blocks without stopping, and could lift and carry only up to ten pounds. Dr. Smarth reported similar limitations on plaintiff's ability to use her hands and to bend, squat, kneel and

turn because of her left-side weakness following her stroke. (Tr. 155–57.)

Dr. Smarth reassessed plaintiff's residual functional capacity on November 13, 1985. In this report, Dr. Smarth gave a diagnosis of rheumatic heart disease, mitral stenosis, supra-ventricular arrythmia, congestive heart failure, "embolic stroke[,] c.v.a. with left side weakness" and a seizure disorder. (Tr. 208.) Dr. Smarth's new prognosis was "guarded," due to plaintiff's ongoing problems with fatigue, shortness of breath after walking only several blocks, left side weakness, and limitations in the use of her left arm and hand. In his second RFC report, Dr. Smarth stated that plaintiff could walk two to three blocks without stopping, rather than one to two blocks as originally reported, but that she could stand for only twenty minutes at a time rather than one hour. In this report, Dr. Smarth did not indicate any limitation on plaintiff's ability to bend, squat, kneel, or turn, although he did state that she could not use public transportation. (Tr. 209.)

Dr. Smarth prepared a third RFC report on plaintiff in February 1989. Dr. Smarth noted that plaintiff could sit for eight hours at a time, stand for twenty minutes continuously and up to two hours in an eight-hour day, and walk up to fifteen minutes continuously. (Tr. 381.) In addition, plaintiff could frequently lift up to five pounds, occasionally carry six to ten pounds,[2] and occasionally bend, squat, crawl, climb and reach. (*Id.*) Dr. Smarth indicated that plaintiff could do simple grasping with her right hand, but not her left hand, and that she could not engage in pushing and pulling of arm controls or fine manipulation with either hand. (Tr. 382.) Dr. Smarth also noted plaintiff's total restriction with respect to activities involving unprotected heights, exposure to marked changes in temperature and humidity, and exposure to dust, fumes and gases, and her moderate restriction with respect to moving machinery. (*Id.*) He also stated that plaintiff could not travel alone by either

---

**2.** On the RFC form, Dr. Smarth left blank the category 6–10 pounds with respect to plaintiff's lifting capability, as well as the category "up to

5" pounds with respect to plaintiff's carrying capability. (Tr. 381.)

bus or subway. (Tr. 383.) Dr. Smarth concluded:

> Ms. Rivera has moderately severe mitral stenosis—she has had probably episodes of arrythmia causing cerebral emboli with left hemiparesis and she also has seizure disorder. She is on digoxin and anticoagulant therapy to prevent further episodes of emboli. She is incapacitated [and] unable to work due to above conditions.

(Tr. 382.)

Dr. Cesar A. Vera, who has also served as plaintiff's treating physician since October 1986, submitted his own RFC report dated January 24, 1989. Dr. Vera's assessment was somewhat different from that indicated in Dr. Smarth's most recent report. Dr. Vera opined that plaintiff's prognosis was "fair," that she could sit continuously for two hours and up to four hours in an eight-hour day, stand continuously for 30 to 60 minutes and up to two hours in an eight-hour day, and walk continuously for 10 to 15 minutes and up to one hour in an eight-hour day. (Tr. 387.) Dr. Vera stated that plaintiff could occasionally lift and carry up to five pounds, and could occasionally bend, squat and climb. In his view, plaintiff could not crawl, but could frequently reach, and could also do simple grasping and fine manipulation with both hands. Dr. Vera noted that plaintiff had total restrictions with respect to unprotected heights, moving machinery and driving, and that she had moderate restrictions regarding exposure to marked changes in temperature and humidity, as well as dust, fumes and gases. (Tr. 388.)

Additional reports in the record prepared by the Secretary's consultative physicians did not provide any RFC assessment of plaintiff. A Dr. Henriquez examined plaintiff on December 28, 1984 and noted that she suffered from rheumatic heart disease and shortness of breath on moderate exercise. (Tr. 178.) Dr. Henriquez concluded that she had a history of mitral stenosis and epilepsy and a history of cerebrovascular accidents "with no residual damage." (Tr. 181.) A Dr. C. Sharma performed a neurological examination of plaintiff on January 7, 1985 and found normal muscle strength in both her upper and lower extremities, with no atrophy, normal reflexes and coordination and no sensory deficits. He concluded that plaintiff did not suffer from any neurological deficit or disability. (Tr. 186.) Finally, Dr. Dae Sik Roh conducted an orthopedic examination of plaintiff on April 24, 1985. Dr. Rho reported a full range of motion in both the upper and lower extremities, with normal sensation and no evidence of atrophy. (Tr. 196–97.)

The only additional RFC report, dated January 31, 1985, was provided by a Dr. L. Marasigan. Although the record is unclear, it appears that Dr. Marasigan did not examine plaintiff and simply relied on unspecified medical records made available to him by the SSA. Dr. Marasigan concluded that plaintiff could lift up to fifty pounds, could frequently lift and carry twenty-five pounds, could stand and/or walk for six hours as well as sit for six hours in an eight-hour day, and had no limitations on her ability to push or pull with either her feet or her hands. (Tr. 187.) He also stated that plaintiff could occasionally balance, stoop, kneel, crouch or crawl, but could not climb, presumably because of her history of seizures. (*Id.*) Dr. Marasigan did not provide the basis for any of his conclusions that differed from the statements made by the plaintiff or the evaluations reported by the treating physicians, merely noting that "[c]laimant has history of mitral valve stenosis. Heavy lifting & etc [sic] should be avoided." (Tr. 188.)

The record also contains the opinion testimony of a Dr. Richard J. Wagman, who was called to testify as an "expert" medical advisor by the Secretary. Dr. Wagman, who apparently had also not examined plaintiff, disagreed with certain of the findings of plaintiff's treating physicians. He opined that plaintiff's mitral stenosis was relatively mild, that her seizures were infrequent, and that he viewed the medical record as inconsistent with the symptoms to which plaintiff and her daughter had testified. (Tr. 285–87.) In addition, Dr. Wagman disagreed with the treating physicians' assessment of plaintiff's residual functional capacity, arguing that, based on

his review of the medical record, she could sit and stand normally without any restrictions, and that she could occasionally lift up to twenty-five pounds. (Tr. 289–91.) Dr. Wagman claimed that the results of plaintiff's stroke had completely cleared up by 1985, as evidenced by the reports of the consultative physicians. (Tr. 299.) Finally, Dr. Wagman commented that plaintiff's alleged medical impairments did not meet and were not equivalent to any of the Secretary's listed impairments under 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1990). (Tr. 292, 324.)

### 4. *Testimony of the Vocational Expert*

Dr. Patricia Dvonch was called by the Secretary to testify as a vocational expert. She stated that work as a "floor girl" was considered light unskilled work "because they generally do not lift much over twenty-five pounds in baskets or something of that sort and [they] carry them a short distance." (Tr. 333.) Floor girls are "on their feet considerably.... there is considerable standing, walking, reaching." (Tr. 333–34.) Dr. Dvonch elaborated on the physical demands of the job by stating that it generally required a worker to be on her feet for eight hours a day. (Tr. 335, 336.)

In addition, Dr. Dvonch testified that plaintiff's former job involved "a considerable lot [sic] of hand-eye coordination in stapling and pricing and arm coordination, reaching." (Tr. 334.) She also stated that work as a factory girl might result in exposure to an excessive amount of dust or lint, especially in older factories, and that it could involve work around dangerous machinery, although this would not be the case in a towel factory. (Tr. 334–35.)

Dr. Dvonch stated that a "younger individual" with a high school education but unable to communicate in English, and with limitations involving work around heights, high temperatures or dangerous machinery, could perform light, unskilled jobs such as a bench assembly worker, a packer or a wrapper. (Tr. 345–48.) However, she also testified that if a claimant had a limitation in her ability to use her non-dominant arm or hand, this would limit the number of available light, unskilled jobs by sixty to seventy percent. (Tr. 354.) Moreover, Dr. Dvonch noted that she was not aware of any light, unskilled jobs for an individual with both a seizure disorder, which would prevent any exposure to heights and dangerous machinery, and a limitation as to left-hand manipulative functions. (Tr. 355–56.) Finally, Dr. Dvonch stated that there would be no jobs in the light, unskilled category for an individual with limitations as to work around machinery and unprotected heights, restrictions as to exposure to dust, fumes and temperature changes, and an inability to sit for a long period of time. (Tr. 357–58.)

### *The Secretary's Findings*
### 1. *The Decision of the ALJ*

The ALJ issued his decision on July 20, 1989. He concluded that plaintiff suffers from "mitral valve stenosis, a seizure disorder, and status post cerebrovascular accident," all of which constitute a "severe impairment" under the applicable regulations. However, he found that plaintiff's impairments were not listed under 20 C.F.R. Part 404, Subpart P, App. 1, and that they did not prevent plaintiff from performing her past relevant work as a "factory floor girl." As a result, the ALJ found that plaintiff was not disabled and denied her application for benefits. (Tr. 225–26.)

In reaching this decision, the ALJ went through the medical evidence in some detail, describing the opinions of Drs. Smarth and Vera regarding plaintiff's residual functional capacity, and noting the distinctions between the two most current treating physicians' reports with respect to plaintiff's physical limitations. In particular, the ALJ described the different medical opinions as to plaintiff's ability to sit, stand, lift objects, and engage in activities involving fine manipulation with her hands. He also noted the medical reports and neurological examinations of the various consultative physicians which—contrary to the treating physicians' reports and plaintiff's testimony—suggested no residual weakness or neurological deficits resulting from

her August 1984 stroke. The ALJ also cited Dr. Wagman's testimony that plaintiff's impairments "do not come close to listings level severity" (Tr. 224), as well as his opinion that the objective evidence failed to document "that her impairments would preclude work at the light exertional level." (*Id.*)

In evaluating this evidence, the ALJ first found that plaintiff suffers from a "serious impairment." He then concluded, however, apparently in reliance on the testimony of Dr. Wagman, that none of plaintiff's conditions met or exceeded any of the standards for a listed, and thus *per se* disabling, impairment.

The ALJ's analysis of plaintiff's capacity to work as a factory girl forms the heart of his decision. Although not without ambiguity, the ALJ appears to adopt Dr. Smarth's functional capacity findings, except insofar as the doctor found that plaintiff suffered from limitations in the use of her right hand. Thus he states:

> Giving great weight to the opinion and conclusion of Dr. Smarth, it is the conclusion of the undersigned that the claimant's impairments render her unable to stand or walk continuously for more than 20 minutes, stand or walk for more than 2 hours during the course of a normal 8 hour work day, lift objects weighing more than 10 pounds, use the left hand for fine manipulation or for pushing or pulling or working at heights or near or with dangerous equipment or machinery. The inability to perform at heights or near or with dangerous machinery is due to her seizure disorder.

(Tr. 224–25.) The ALJ stated that he gave greater weight to the findings of Dr. Smarth than those of Dr. Vera because of Dr. Smarth's longer association with the claimant as her treating physician. The one conclusion of Dr. Smarth that the ALJ explicitly discounted was the doctor's statement that plaintiff was also unable to use her right hand for fine manipulation. As the ALJ noted, none of the other medical evidence in the record mentioned problems with plaintiff's right hand or arm, and plaintiff testified to her use of her right

hand for dressing and other personal activities. (Tr. 225.) The ALJ neither discounted nor expressly adopted the additional and seemingly pertinent findings of Dr. Smarth that plaintiff could not do simple grasping with her left hand, could not be in a dust-laden environment, could only bend "occasionally," suffered from drowsiness as a result of medication, could not travel by public transportation on a daily basis, and was not able to work.

The ALJ next briefly addressed plaintiff's testimony regarding the degree of her functional limitations, which he found not credible. In particular, the ALJ noted that plaintiff had apparently never mentioned to a doctor her complaints of chest pain, right leg pain and back pain. Moreover, the ALJ referred to a September 1984 vocational report in which plaintiff had stated that she was capable of performing light household chores and using public transportation, as well as her daughter's testimony regarding the infrequency of her mother's seizures—which the ALJ incorrectly described as "no more than one seizure a year since 1982" (Tr. 225)—and her occasional trips outside her home. (*Id.*)

Finally, the ALJ determined, after assessing plaintiff's residual functional capacity and the requirements of her past work, as described by both Dr. Dvonch and plaintiff, that plaintiff was capable of performing her past job "as a factory floor girl (towel factory)." (Tr. 225.) In doing so, the ALJ cited the testimony of the vocational expert, whom he described as testifying that such work did not involve dangerous equipment, as well as plaintiff's testimony that she could perform the work "either standing or sitting." Significantly, he also found that the job "did not require fine manipulation with the left hand and it required no significant lifting whatsoever." (Tr. 225.) Accordingly, the ALJ recommended denial of benefits.

### 2. *The Appeals Council Decision*

The Appeals Council issued an initial decision dated May 15, 1990, in which it incorrectly appeared to assume that plaintiff had not objected to the ALJ's decision.

(Tr. 216.) After the belated discovery of those objections, the Appeals Council issued a second decision, dated June 19, 1990, in which it upheld the conclusion of the ALJ that plaintiff was not disabled. (Tr. 420–25.)

The Appeals Council responded at some length to plaintiff's objections to the ALJ's decision. The Council first focused on the question of plaintiff's left-side weakness, which had been diagnosed after her 1984 stroke. Although her treating physician, Dr. Smarth, had included in his 1989 RFC report clinical findings of left-side weakness, hyperactive reflexes and "left Babinski's sign" (Tr. 400)—all of which supported the doctor's conclusion that plaintiff was unable to use her left hand for work-related activities—the Council stated that it was "unclear whether these findings refer to current examinations, or are a restatement of the information contained in the hospital report of 1984." (Tr. 421.) Based on its reading of the balance of the record, and without any effort to clarify the matter with Dr. Smarth, the Council concluded that Dr. Smarth's notations in the 1989 report "actually refer to the claimant's history and do not represent current clinical findings." (*Id.*) As a result, the Council rejected the notion that plaintiff "is significantly limited by residuals of the *original* CVA in 1984." (*Id.*) (emphasis in original).

The Council next addressed two of plaintiff's other claimed impairments—her heart condition and her tendency to suffer seizures. With respect to her cardiac condition, the Council simply summarized the opinion of Dr. Wagman, whom it described as an "expert," [3] that plaintiff suffered from a "relatively mild" mitral stenosis and that there was no evidence of congestive heart failure. (Tr. 421.) With respect to plaintiff's seizure condition, the Council found that it was controlled by medication and did not "significantly interfere" with plaintiff's ability to engage in work-related activity, a conclusion that it apparently premised on its finding that her last seizure was in either 1986 or 1988. Nonetheless, the Council "concede[d]" that plaintiff

could not perform work involving heights or dangerous machinery because of "the possibility of a seizure." (Tr. 421.)

The Council also rejected plaintiff's contention that the ALJ had not complied with the "treating physician" rule. Thus, although it had appeared earlier in its decision to reject the basis for Dr. Smarth's finding of a continuing left-side impairment (Tr. 421), the Council cited approvingly the ALJ's adoption of the doctor's 1989 RFC report "almost in its entirety," with the one stated exception of his reference to limitations in plaintiff's ability to use her right hand and arm. (Tr. 424.) The Council also referred to and apparently agreed with the ALJ's conclusions regarding plaintiff's residual functional capacity; those conclusions expressly adopted Dr. Smarth's findings with respect to her ability to lift, carry, stand, sit and walk. (Tr. 423.) Thus, although the Council stated that it "will accept the Administrative Law Judge's findings that the claimant cannot use the left hand for fine manipulation," (Tr. 424), it also appeared to adopt the ALJ's finding from Dr. Smarth's RFC report that plaintiff could not use her left hand for pushing and pulling. Nonetheless, like the ALJ, the Council made no mention of Dr. Smarth's conclusion that plaintiff could not engage in simple grasping with her left hand.

As for plaintiff's other claims of impairments, the Council rejected her complaint of back pain and her attorney's suggestion that she suffered significant pain from her monthly injection of Bicillin. (*Id.*) It further found that the ALJ had properly considered the combined effects of her multiple impairments. In this regard, the Council argued that since plaintiff suffered from seizures only "once or twice per year," and since "there are no discernable [sic] clinical signs of neurological residuals of the CVA, it would appear that the sum total of the limitations from all impairments is no greater than the limitations imposed by the rheumatic heart disease and mitral stenosis alone." (*Id.*) In offering this conclusion, the Council did not seek to reconcile its

---

3. Dr. Wagman is not a cardiologist. (Tr. 282.)

observation about an absence of neurological residuals with the ALJ's finding— adopted by the Council—that plaintiff could not use her left hand for either fine manipulation or for pushing and pulling, or with the ALJ's failure to address Dr. Smarth's finding that plaintiff could not use her left hand even for simple grasping.

Finally, the Council rejected the suggestion that the medications taken by plaintiff adversely affected her condition. In so doing, the Council discounted the references by plaintiff's two treating physicians to "drowsiness" and sleepiness, stating that "the Council believes that the notations ... represent a generalized statement of *possible* side-effects of medication." (Tr. 424) (emphasis in original).

In conclusion, the Council noted its agreement with the ALJ's finding of plaintiff's residual functional capacity and his conclusion that she could return to her prior work as a "floor girl." (Tr. 425.) Consequently, the Council denied plaintiff's application for disability benefits. This denial constitutes the Secretary's final decision.

### *Analysis*

#### 1. *General Standards*

A claimant seeking social security benefits is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." *Wagner v. Secretary of Health and Human Services*, 906 F.2d 856, 860 (2d Cir.1990) (citing 42 U.S.C. § 423(d)(1)(A)). The analytical framework for evaluating claims of disability is defined by regulations of the Secretary. *See* 20 C.F.R. §§ 404.1520, 416.920 (1990). As summarized by the Second Circuit:

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982) (*per curiam*).

A claimant "bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment," but once the claimant makes such a showing "the burden shifts to the Secretary to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform. ..." *Id.* Moreover,

In assessing a claim of disability, the Secretary must consider objective and subjective factors, including the following: (1) objective medical facts; (2) diagnoses or medical opinions based on these facts; (3) subjective evidence of pain and disability testified to by the claimant or other witnesses; and (4) the claimant's educational background, age and work experience.

*Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir.1984). *Accord, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983); *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir.1983); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir.1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978).

■ Under 42 U.S.C. § 405(g), the factual findings of the Secretary are conclusive if they are supported by substantial evi-

dence; they may not be rejected despite the existence of substantial evidence supporting the plaintiff's contentions. *See, e.g., Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984); *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983). Of course, in the absence of substantial evidence the Secretary's findings cannot stand.

■ Substantial evidence is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). *Accord, e.g., Rivera v. Sullivan,* 923 F.2d at 967; *Wagner v. Secretary of Health and Human Services,* 906 F.2d at 860; *State of New York ex rel. Bodnar v. Secretary of Health and Human Services,* 903 F.2d 122, 126 (2d Cir. 1990). In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn. *See, e.g., id.; Mongeur v. Heckler,* 722 F.2d at 1038.

■ With respect to the Secretary's legal conclusions, or more generally his application of legal principles, judicial review is *de novo. See, e.g., Townley v. Heckler,* 748 F.2d at 112; *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979); *Spena v. Heckler,* 587 F.Supp. 1279, 1282 (S.D.N.Y.1984) (quoting *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 (11th Cir.1982)). Thus, "where evidence is not properly evaluated because of a misapplication or erroneous view of the law, the Secretary's decision cannot be upheld." *Ramirez v. Heckler,* 1986 WL 8304, *4, 30/86 Star. Dec. 110, 120 (S.D.N.Y. July 18, 1986). *Accord, e.g., Smith v. Bowen,* 687 F.Supp. 902, 904–05

(S.D.N.Y.1988); *Ceballos v. Bowen,* 649 F.Supp. 693, 698 (S.D.N.Y.1986).

In this case, the decision of the Secretary rests in part on findings that are simply not supported by the evidence in the administrative record, and in part on unarticulated findings that also appear to be inconsistent with record evidence or with findings explicitly made by the ALJ and adopted by the Appeals Council either expressly or by implication. Moreover, the Secretary has failed to develop a complete record in several key areas. In addition, the decision of the Secretary implicitly rejects testimony by witnesses and opinions offered by plaintiff's treating physicians, without making the requisite credibility findings or identifying the evidence that could justify rejecting such testimony or opinions.

### 2. *Plaintiff's Ability to Do Her Prior Work*

Plaintiff does not contest the Secretary's finding at step 3 of the mandated analysis to the effect that she does not suffer from an impairment listed in Appendix 1 of the Secretary's regulations. *See* 20 C.F.R. § 404.1525 & Pt. 404 Subpt. P, App. 1. Rather, the focus of her challenge is on the Secretary's conclusion that she can still do her prior work as a factory floor girl. Before discussing the evidence, however, I briefly address a legal issue that impacts on the appropriate standard for evaluating that evidence.

■ In assessing whether a claimant can perform the "kind of work" that she has "done in the past," 20 C.F.R. § 404.1520(e), the Secretary normally focuses in the first instance on the physical demands of the job previously performed by the claimant. This analysis can become more complicated, however, if the particular job held by the claimant imposed physical requirements significantly different from the demands usually encountered in that category of work. If the claimant's actual job was significantly more arduous than the general classification of work into which it fitted, the Secretary must decide whether an inability to perform the precise job pre-

viously held suffices to establish disability, or whether the claimant must also show an inability to meet the lesser physical demands of her past general "kind of work." By the same token, if the claimant's past job was less arduous then the general category of work involved, the Secretary must decide whether the claimant can establish disability by demonstrating her inability to meet the demands generally imposed by her prior line of work, or must also show that she cannot meet the lesser demands of her particular prior job, even if its physical requirements were in some sense aberrational.

For guidance on these issues, the Secretary has issued Social Security Ruling 82–61, which in effect requires that in both situations the claimant must prove her inability to perform both her particular past job and the demands generally imposed by that type of work. The Ruling states in relevant part:

> Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform
>
> 1. The actual functional demands and job duties of a particular past relevant job; or
>
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

SSR 82–61 (1982) 836, 838.

In this case, plaintiff's description of the demands of her prior job in the towel factory and the vocational expert's recitation of the general demands of work as a factory floor girl differed in some key respects. Of particular significance, plaintiff testified that her past job did not require any significant lifting and carrying and that she could, for the most part, perform her work either sitting or standing. In contrast, Dr. Dvonch reported that the work of a factory floor girl entails lifting and carrying of "not ... much over" twenty-five pounds for short distances. (Tr. 333.) Dr. Dvonch also noted that work as a factory floor girl involves "considerable standing, walking,

[and] reaching" that requires workers to be on their feet eight hours a day. (Tr. 334, 335.) In addition, Dr. Dvonch observed that many factories are old, and thus expose the workers to "an excessive amount of dust or lint...." (*Id.*) She also noted that some factories have dangerous equipment or machines, although this is not generally the case in towel factories. (Tr. 335.)

In evaluating the evidence in this case, the ALJ explicitly, and the Appeals Council implicitly, relied upon SSR 82–61, and found plaintiff not disabled on the basis that she could still perform her particular past job, as she had described it. Neither the ALJ nor the Council specifically found that she could meet the demands of the general job category of factory floor girl as described by Dr. Dvonch. In fact, the record does not contain substantial evidence to suggest that plaintiff could meet either set of requirements.

(a) Plaintiff's Prior Job

■ Plaintiff's treating physician, Dr. Smarth, found—and the ALJ and the Appeals Council accepted—that plaintiff was strictly limited in her ability to stand and walk, that she could not lift more than ten pounds, and that she was unable to perform fine manipulations with her left hand. The ALJ also adopted Dr. Smarth's finding that plaintiff could not use her left hand for pushing and pulling, a conclusion implicitly accepted by the Appeals Council. Dr. Smarth made a number of additional functional capacity findings, which were neither expressly rejected nor expressly adopted by the ALJ and the Appeals Council. In particular, Dr. Smarth concluded that plaintiff could not use her left hand even for simple grasping, that she could not work in a dust-laden environment, and that she could not use public transportation alone. These findings were partially corroborated by plaintiff and her daughter, both of whom testified regarding her functional limitations and her lack of mobility.

Given this record, the Secretary's conclusion that plaintiff can do her prior job in the towel factory cannot stand. The problems with the decision involve both a fail-

ure to make necessary findings to sustain the ultimate conclusion and an absence of substantial evidence to support that conclusion.

The first problem with the decision of the Secretary is that it is inconsistent with the findings concerning limitations on plaintiff's use of her left hand. As noted, the Secretary concedes that plaintiff cannot perform "fine manipulation" and "pushing and pulling" with that hand. The record, however, appears to indicate that plaintiff's prior job required both of these skills, and the Secretary has failed to explain away this evidence.

We start with a basic definitional problem concerning the meaning of the term "fine manipulation." The statute and regulations are silent on this matter, but the Secretary's counsel in this case suggests, based on her reading of two Social Security Rulings, that gross manipulation involves "reaching (extending the hands and arms in any direction), and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands." (February 25, 1991 letter to the Court from Special Assistant United States Attorney Susan D. Baird) (citing SSR 83–14). In contrast, "fine manipulation involves fingering (picking, pinching or otherwise working primarily with the fingers) or feeling." (*Id.*) (citing SSR 85–15). If we accept counsel's proffered definition for purposes of analysis, it becomes apparent that plaintiff's undisputed testimony establishes that a significant portion of her work involves such fine manipulation.

According to plaintiff, one of her principal functions in the towel factory was to attach price tags to the towels by use of a staple gun. She testified that, in order to do this, she held both the towel and the price tag in her left hand and the staple gun in her right hand, and used the gun to affix the tag to the towel. From her testimony, it appears that in order to perform this operation she necessarily had to use the fingers of her left hand to align the tag

in the proper location on the towel and then to hold it there until it was stapled. If so, this task involved "fine manipulation" as defined by the Secretary's counsel and is inconsistent with the Secretary's conclusion that plaintiff could perform her prior job.

In addition, plaintiff reported that a second major component of her job involved using a ruler on the towel in order to ascertain whether the markings on the towel were straight and in accordance with the towel design. The testimony does not disclose whether plaintiff was required to use her left hand in this procedure, but if so, the function involved would plainly also call for "fine manipulation," since the alignment of a ruler typically involves the use of the fingers for precise adjustments.

Although the record could be viewed as ambiguous concerning the extent to which plaintiff actually was called upon to utilize her fingers in either of these operations (*but cf.* Tr. 344) (vocational expert reports extensive demand for hand-eye coordination in carrying out these tasks), it bears emphasis that the ALJ failed to develop the record in this respect, as was his obligation even though the claimant was represented by counsel. *See, e.g., Decker v. Harris,* 647 F.2d 291, 299 (2d Cir.1981). *See also Ceballos v. Bowen,* 649 F.Supp. at 698; *Losco v. Heckler,* 604 F.Supp. 1014, 1020 (S.D.N.Y.1985) ("the ALJ is under the general duty affirmatively to develop the record and to ensure that all the necessary and relevant information is simply produced"). The ALJ never asked either the plaintiff or the vocational expert whether performing work as a factory floor girl required any use of the fingers, and, if so, to what extent.[4] The failure to flesh out the record on this key question is in itself a sufficient ground for rejecting the Secretary's conclusion that plaintiff could perform her prior work. *See, e.g., Echevarria v. Secretary of Health and Human Services,* 685 F.2d 751, 755 (2d Cir.1982); *Ceballos v. Bowen,* 649 F.Supp. at 698.

---

4. The failure of the Secretary to develop a sufficiently complete record regarding the requirements of plaintiff's prior job in order to permit the necessary factfinding was a point specifically made by this Court in originally remanding this matter for an additional administrative hearing in 1988. (*See* Report and Recommendation dated February 5, 1988 at 18–19.)

■ In addition, even if this record is deemed adequate for a determination of whether plaintiff's past job required some amount of fine manipulation with her left hand, the Secretary's decision cannot stand because he failed to make any meaningful findings as to the specific requirements of plaintiff's prior job. It is self-evident that a determination by the Secretary must contain a sufficient explanation of his reasoning to permit the reviewing court to judge the adequacy of his conclusions. *See, e.g., Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988); *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984); *Berry v. Schweiker,* 675 F.2d at 469. Moreover, an ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error." *Ceballos v. Bowen,* 649 F.Supp. at 702 (citing *Valente v. Secretary of Health & Human Services,* 733 F.2d 1037, 1045 (2d Cir.1984)). Although the ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony," *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981), he cannot "pick and choose" evidence in the record that supports his conclusions. *Fiorello v. Heckler,* 725 F.2d at 175–76; *Andino v. Bowen,* 665 F.Supp. 186, 190 (S.D.N.Y.1987).

■ In this case, as noted, the limited evidence in the record strongly suggests that plaintiff's prior job required the use of the fingers on her left hand. The ALJ and Appeals Council, however, fail to acknowledge or address this evidence and fail to offer any explanation for their conclusory finding that the prior job did not require "fine manipulation". This is plain error.

■ In reaching this conclusion, I take note of the Secretary's argument—first advanced at oral argument and then by letter to the court—that even if the record did not contain evidence concerning the extent of the manipulative functions required by plaintiff's prior job, the Secretary's finding that the job did not require fine manipulation must be upheld, since the absence of evidence reflects a failure by plaintiff to

carry her burden of proof. This argument cannot be sustained. As noted, it is the obligation of the Secretary to ensure a complete evidentiary record even when the claimant is represented by counsel, a requirement that follows from the oft-noted observation that the disability hearing is not an adversarial proceeding, *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 48 (2d Cir.1972); *Ceballos v. Bowen,* 649 F.Supp. at 698, and is to be guided by the overriding congressional policy of remediation. *See, e.g., Vargas v. Sullivan,* 898 F.2d at 296 (citing cases). Under these circumstances, it is not surprising to find no caselaw supporting the Secretary's contention that the absence of evidence on a key issue is the equivalent of "substantial evidence" supporting the Secretary's ultimate decision.

In any event, the Secretary's argument is misplaced since, as noted, there is evidence in the record indicating that plaintiff's prior job did require fine manipulation. It also bears emphasis that, as previously noted, the Secretary's decision on this point must be rejected since he failed to make any explanatory findings to support his conclusion that the prior job did not require fine manipulation. *See generally Treadwell v. Schweiker,* 698 F.2d 137, 142–43 (2d Cir.1983) (Secretary's decision cannot be upheld on grounds different from those relied on by the Secretary at the administrative level).

A related problem with the Secretary's decision is that it fails to address plaintiff's conceded inability to use her left hand for pushing and pulling. Plaintiff testified that one of the functions of her prior job, which the vocational expert corroborated, was folding the towels and inserting them into bags. Although the ALJ did not explore the exact mechanics of this operation, it appears that—depending on the size of the bags and the number of towels to be stuffed into each bag—this process would require that plaintiff use both hands and that each would have to be used for either pushing or pulling. If so, this aspect of the work would appear to be beyond plaintiff's

physical capacity.[5]

Since the ALJ failed to develop the record in this respect, the decision of the Secretary cannot stand. Moreover, since neither the ALJ nor the Appeals Council made any specific findings on plaintiff's capacity to do this aspect of her work—despite the testimony of the plaintiff that suggested that she could not—the Secretary's decision must be rejected for this separate reason as well.

Still another fatal failing in the Secretary's decision concerns Dr. Smarth's finding that plaintiff cannot use her left hand for simple grasping. Neither the ALJ nor the Appeals Council explicitly rejected this finding, and indeed the Council, while expressing some skepticism about the basis for Dr. Smarth's conclusions, nonetheless upheld the ALJ's decision, which it characterized as having approved all the findings in Dr. Smarth's RFC report except those concerning plaintiff's use of her right hand and arm. Thus, it may be inferred that, by indirection, the Council approved Dr. Smarth's conclusion that plaintiff also cannot do simple grasping with her left hand.[6]

Given Dr. Smarth's finding, the Secretary's decision cannot stand, because plaintiff's description of her job functions—which the Secretary has adopted—makes it clear that all or virtually all of her activities required her to use her left hand for at least simple grasping, if not more sophisticated tasks. The Secretary has not suggested any basis for ignoring this testimony and, in the absence of any specific findings discrediting it, plaintiff must be found to lack the capacity to do her prior job.

There are still other grounds to reject the Secretary's conclusion that plaintiff could return to her prior job. As noted, Dr. Smarth found that plaintiff cannot work in a dust-laden environment—a finding also implicitly adopted by the Secretary—and the vocational expert testified that many factories of the sort in which floor girls work are in fact quite dusty, probably as a result of lint.

■ Despite this limitation, the ALJ made no inquiry as to whether the particular factory in which plaintiff had worked was dust-free, and thus the record is barren of evidence on this key point. This is reversible error. Moreover, since the ALJ and the Appeals Council made no specific finding as to whether plaintiff's prior work was in such an environment, this also constitutes plain error.

■ In addition, the Secretary's decision is undermined by his reliance on pure speculation as to whether Dr. Smarth's reference to drowsiness was intended to refer to "possible" side effects of plaintiff's medication or her actual reaction to them. The Social Security Act requires that the Secretary obtain a complete record of the claimant's medical history for at least the prior twelve months from the treating physician before even utilizing a consulting physician. 42 U.S.C. § 423(d)(5)(B). Necessarily, then, the Secretary was obliged to clarify this ambiguity with the treating physician rather than engaging in bald guessing as to what Dr. Smarth meant by the comments in his report. This failing is even more egregious because the language used by Dr. Smarth is more suggestive of actual rather than of theoretical symptomology

---

5. I note that item 12(iv) of the standard form "Physicians Report for Claim of Disability Due to Physical Impairment" prepared by Dr. Smarth and relied upon by the Secretary refers to "pushing and pulling of arm controls." (Tr. 403.) Although this appears to define a specific type of "pushing and pulling," the Secretary makes no effort in this case to read the RFC Report so narrowly. Moreover, I note that the Secretary's Rulings instruct the Secretary to look merely to the claimant's ability to push or pull in the general sense of the term in assessing the claimant's ability to perform her past rele-

vant work or other work. See, e.g., S.S.R. 86–8 (1990 Supp.) 501, 506. Cf. 20 C.F.R. § 404.-1567(b) (defining one form of light work as "sitting most of the time with some pushing or pulling of arm or leg controls.").

6. It also bears emphasis that the Secretary could not, under the treating physician rule, reject this conclusion *sub silentio*. See, e.g., *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir.1990); *Schisler v. Bowen*, 851 F.2d 43, 46–47 (2nd Cir.1988); *Hidalgo v. Bowen*, 822 F.2d 294, 296–97 (2d Cir. 1987) (citing cases). If that were the Secretary's interpretation of the Appeals Council decision,

(*see* Tr. 400, item 10), and because the ALJ disregarded a request by plaintiff's counsel at the hearing that he issue a subpoena for the treating physician to clarify the potential ambiguities in his RFC report. (Tr. 296–97.) *See, e.g., Treadwell v. Schweiker,* 698 F.2d at 141–42.[7]

▪ Still another fatal flaw in the Secretary's decision is the failure of the ALJ and the Appeals Council to address the fact that plaintiff apparently cannot use public transportation alone. Both plaintiff and her daughter testified to this fact, which corroborated a finding of Dr. Smarth. There is no directly contrary evidence, and the ALJ and Appeals Council did not explicitly discredit the testimony of the two women or the finding of Dr. Smarth on this point. Although the ALJ noted in passing that plaintiff had stated in a September 1984 vocational report that she used public transportation (Tr. 50), he did not indicate whether he read this as referring to plaintiff's pre- or post-stroke activities. Moreover, he never attempted to reconcile this notation with either the testimony of plaintiff and her daughter, or the reports of the treating physicians, including Dr. Smarth and Dr. Philips, both of whom reported that since her stroke plaintiff could not use public transportation by herself.[8] There is also no record evidence that plaintiff could travel to her prior job other than by public transportation. Given this state of the record, and the absence of any findings discrediting the testimony of the plaintiff and her daughter and the reports of the treating physicians, we find another basis for concluding that plaintiff cannot perform her prior job, and that the Secretary's decision is itself unsupported by substantial evidence. *See, e.g., Lopez Diaz v. Secretary of Health, Education & Welfare,* 585 F.2d 1137, 1142 (1st Cir.1978); *Andino v. Bowen,* 665 F.Supp. at 192 (inability of plaintiff to ride subway or bus alone substantiates finding or disability).

▪ Finally, I note another significant problem with the analysis undertaken by the Secretary. As discussed, the Secretary relies solely on the first prong of Social Security Ruling 82–61, which indicates that a person will be found not disabled if she can perform "[t]he actual functional demands and job duties of a particular past relevant job," irrespective of whether she can perform the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." If applied literally, this ruling would compel a finding of no disability even if the claimant's prior job was uniquely lenient in its physical requirements—as compared with the normal requirements for such an occupation—and even if that one job were filled or no longer in existence. Such a result would be plainly inconsistent with the remedial purposes of the Social Security Act, *see generally Vargas v. Sullivan,* 898 F.2d at 296, and appears in fact to be inconsistent with the wording of 42 U.S.C. § 423(d)(2)(A). That provision authorizes a disability award if the claimant "is unable to do his previous work" or "any other kind of substantial work which exists in the national economy...." Significantly, this section defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Although this definition refers directly to work other than the claimant's "previous work," the most reasonable reading of the provision is that a claimant must be unable to do work of the general type that he previously did, but that if jobs with the particular physical demands that the

---

it would provide still another basis for rejecting that decision.

**7.** The Appeals Council committed a similar error when it simply assumed, without any basis, that Dr. Smarth's 1989 findings were not based on a contemporaneous examination, but rather were simply a reiteration of his 1984 findings. This error is less significant, however, since the Council went on to approve the ALJ's findings, which themselves adopted Dr. Smarth's basic residual functional capacity estimates.

**8.** If the Secretary is not crediting the testimony of a witness, he must make specific credibility findings. The failure to consider the testimony of witnesses and to render credibility findings "fatally undermines" the decision of the Secretary, *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 261 (2d Cir.1988). *See also Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987);

claimant previously encountered are not generally available in the national economy, the claimant cannot be deemed able to perform his "previous work." *Cf. Jock v. Harris*, 651 F.2d 133, 135 (2d Cir.1981) (claimant must show she cannot return to "previous work as a cashier, not simply to her former job as a 'supermarket cashier'"); *Walker v. Mathews*, 546 F.2d 814, 818–19 (9th Cir.1976) (jobs must be available in significant numbers). Indeed, in the one case that we have found in which the claimant's particular prior job was less onerous than the general requirements for that type of work, the court declined to apply SSR 82–61. *See Patton v. Williams*, 1989 WL 134822 (N.D.Ill. Oct. 30, 1989) (rejecting application of first prong of SSR 82–61 when plaintiff's prior job requirements were unique and the job is no longer available to claimant).

In this case, the record reflects a significant disparity between the demands of plaintiff's previous general type of work, as described by the vocational expert, and the demands of plaintiff's actual job, as testified to by her at the hearing. Most significantly, as noted, the vocational expert described the work performed by factory floor girls as "light" because they "generally do not lift much over twenty-five pounds," and as requiring extended standing and walking of up to eight hours a day.[9] In contrast, plaintiff testified that she did no lifting and carrying except for her job of stapling—which obviously involved lifting and holding the towel and staple gun—and her function of stuffing towels in bags. She also testified that she could perform her job either standing or sitting, although she occasionally had to walk short distances.

The ALJ and Appeals Council took no notice of this discrepancy between the two descriptions of the physical demands of a factory floor girl. This poses two problems. First, it is not at all clear whether the type of job described by plaintiff—that is, one involving no significant lifting or carrying and no significant standing and walking—is in fact still available in meaningful numbers, a question that the ALJ did not pose to the vocational expert. If not, the conclusion that plaintiff was physically capable of performing her particular past job could not itself justify a conclusion of non-disability. Second, the very ruling invoked by the Secretary indicates that in the case of "significant variations between a claimant's description and the description shown in the [Dictionary of Occupational Titles]," the ALJ is to resolve the conflict, either by contact with the former employer or by more inquiries to the claimant—apparently to ensure that the claimant has not erred in her description of her prior job—and, if necessary, by use of a vocational expert. In this case, the ALJ called such an expert to testify, but then made no effort to resolve the apparent conflict in the job descriptions by posing appropriate questions to the vocational expert or by making relevant findings. Moreover, contrary to the instructions of SSR 82–61, the ALJ did not seek to clarify this question by asking follow-up questions of the plaintiff. The latter failing is particularly egregious because in a 1985 vocational report, plaintiff had indicated that her job involved four hours of standing, two hours of walking, and two hours of sitting. The ALJ did not ask plaintiff to clarify this apparent discrepancy with the hearing testimony, thus reflecting still another failure to develop a complete record regarding the physical requirements of plaintiff's job. Moreover, these differences between the testimony of plaintiff and that of the vocational expert are obviously significant since the Secretary adopted the findings of Dr. Smarth that plaintiff could not lift and carry objects weighing more than ten pounds and could walk continuously for only twenty

---

*Stieberger v. Sullivan*, 738 F.Supp. 716, 742–43 (S.D.N.Y.1990).

**9.** 20 C.F.R. §§ 404.1567(b) and 416.967(c) define "light work" as involving "lifting no more than 20 pounds at a time with frequent or carrying of objects weighing up to 10 pounds ... [and re-

quires either] a good deal of walking or standing, or ... sitting most of the time with some pushing and pulling or arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."

1358

minutes at a time, and only two hours in an eight-hour day.

Under these circumstances, and in light of plaintiff's previously discussed limitations, the Secretary's conclusion that plaintiff is not disabled because she can perform the physical demands of her particular prior job cannot withstand analysis.

(b) Plaintiff's Prior Type of Work as Generally Performed

■ As noted, SSR 82–61 provides that a claimant is to be deemed not disabled at Step 4 of the Secretary's analysis if she can perform "the functional demands and job duties of [her past] occupation as generally required by employers throughout the national economy." Although the propriety of this ruling has been questioned, see, e.g., Cristanudo, "Social Security Disability Practice: Past Relevant Kind of Work Denials (SSR 82–61)," 17 Soc.Sec.Rep.Serv. 897 (1987), we need not reach that issue in this case. The Secretary never made any findings as to plaintiff's inability to work as a factory floor girl in general, and the record reflects without contradiction that plaintiff lacks the physical capability to perform her prior work as it is generally done.

The evidence reflecting the general physical demands of the job of factory floor girl is found in the unrebutted testimony of the vocational expert, Dr. Dvonch. As indicated, Dr. Dvonch testified that employees in this category of work must sometimes lift and carry items weighing up to or more than twenty-five pounds, and must engage in extended standing and walking for up to eight hours a day. These requirements alone are inconsistent with plaintiff's physical limitations as found by the Secretary, since she is unable to lift and carry more than ten pounds, and is limited to standing or walking continuously for only twenty minutes at a time and two hours total in an eight-hour day. Moreover, the additional limitations documented in the record—including plaintiff's inability to tolerate a dust-laden environment, her inability to use her left hand for pushing and pulling or for simple grasping, her inability to travel

alone by public transportation, and her inability to work near dangerous equipment or machinery—all provide additional independent bases for finding her unable to perform the general requirements of her prior type of work.

This conclusion receives further confirmation in the testimony of Dr. Dvonch to the effect that she knew of no jobs in the light, unskilled category—which includes factory floor girl—for an individual with a seizure disorder and a limitation in left-hand manipulative functions. (Tr. 355.) Since the Secretary credited Dr. Smarth's conclusion that plaintiff suffers from these limitations, it follows from the unrebutted evidence in the record that plaintiff could not perform the work of a factory floor girl as it is generally found in the national economy.

3. *The Remedy*

■ Since the Secretary's decision cannot be sustained on the current record, the question to be faced is whether this case should be remanded to enable the Secretary to fill in gaps in the record and make appropriate findings with respect to plaintiff's claim of disability, or else remanded simply for a calculation of benefits. I conclude that plaintiff should at this stage of these proceedings be deemed disabled and the case remanded solely to determine the amount of benefits.

■ The Second Circuit has noted that "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) (citing *Havas v. Bowen,* 804 F.2d 783, 786 (2d Cir.1986)). *See also Murdaugh v. Secretary of Health and Human Services,* 837 F.2d 99, 102 (2d Cir.1988); *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 644 (2d Cir.1983); *Gibbons v. Bowen,* 653 F.Supp. 1478, 1483 (S.D.N.Y.1987). In such a case, a remand solely for the purpose of calculating benefits is appropriate. Stated differently, the payment of benefits may be ordered "when the record provides persuasive proof of dis-

ability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980). If, on the other hand, the record would permit a conclusion by the Secretary that plaintiff is not disabled, the appropriate remedy is to remand for further proceedings rather than for the calculation of benefits. *See, e.g., Johnson v. Bowen,* 817 F.2d at 987; *Parker v. Harris,* 626 F.2d at 235.

As noted, the evidence of record suggests without contradiction that plaintiff's prior job in the towel factory involved some degree of fine manipulation with her left hand. There is simply no substantial evidence to sustain the Secretary's contrary conclusion that the job did not involve such fine manipulation. There is also unrebutted evidence that plaintiff's towel factory job required a certain degree of pushing and/or pulling with the left hand, as well as simple grasping. Finally, the evidence of record reflects that plaintiff cannot work in a dust-laden environment, and cannot travel alone by public transportation.

The treating physician, whom the Secretary credited except in one irrelevant detail, found that plaintiff was unable to perform any of these functions. It necessarily follows that there would be no evidentiary basis for the Secretary to conclude that plaintiff could perform her prior job in the towel factory. Accordingly there is no reason to remand for a second time for the purpose of further considering whether plaintiff could perform that particular job. *See, e.g., Carroll v. Secretary of Health & Human Services,* 705 F.2d at 644 (if Secretary's decision is not supported by substantial evidence, a remand for further hearing is improper unless Secretary shows "good cause" for lack of evidentiary support for his conclusions); *Maher v. Bowen,* 648 F.Supp. 1199, 1203 (S.D.N.Y.1986).

Moreover, although the Secretary has made no finding on the question of whether plaintiff can perform the type of functions generally demanded of a factory floor girl, the testimony of the vocational expert is dispositive of this issue. Since the Secretary has found that plaintiff cannot lift and carry more than ten pounds, cannot stand and walk for more than 20 minutes at a time and for more than two hours per work day, and since the uncontradicted evidence shows that she cannot work in a dust-laden environment or around dangerous machinery, and cannot travel alone by public transportation, there would be no basis for the Secretary to find that plaintiff could perform the general requirements of a factory floor girl as described by Dr. Dvonch.

In short, plaintiff must be deemed unable to perform her prior type of work, however defined. There remains the question of whether the Secretary could permissibly find that she is capable of undertaking any other type of work.

■■■ Once a claimant demonstrates her inability to do her past relevant work, as plaintiff has done, the Secretary bears the burden of proof as to whether plaintiff would be able to perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 416.920(f), 416.966. In the present case, the Secretary did not reach this issue, since he found that plaintiff could perform her past relevant work. However, based on the evidentiary record and application of the so-called grid regulations, set out at 20 C.F.R. Part 404, Subpt. P, App. 2 (1989), a finding of disability would be compelled.

The tables in Appendix 2 assist the Secretary in assessing a claimant's ability to perform other substantial gainful activity. These tables take account of a claimant's age, education, job skills and residual functional capacity in determining whether the claimant is disabled from performing work in any of five basic job categories. *See, e.g., Vargas v. Sullivan,* 898 F.2d 293, 294 (2d Cir.1990). In this case, the only applicable categories are "light work" and "sedentary work." As discussed, plaintiff's functional as well as non-exertional limitations are inconsistent with an ability to perform a wide range of "light work" as described in the Secretary's regulations. Moreover, the vocational expert testified that she was not aware of any jobs in the light category for a claimant such as plaintiff, with a seizure disorder and limitations

in the use of her non-dominant hand. (Tr. 355–56.)

Since plaintiff could not do light work, the analysis then turns on whether plaintiff was able to do sedentary work. In this case, the ALJ did not ask Dr. Dvonch questions directed specifically to this issue, because he assumed that if plaintiff were limited to sedentary work, he would apply 20 C.F.R. Part 404, Subpt. P, App. 2, Table 1, Rule 201.17, which would mandate a finding of disability if plaintiff were 45 years old at the time she filed her application. (Tr. 340.)

The ALJ noted that since plaintiff was forty-four years and seven months old when she applied for disability benefits, technically Rule 201.23 could be applicable, since she fell in the age 18–44 category at the time of her application. Applying this rule would result in a finding that plaintiff was not disabled. Nonetheless, as the ALJ noted, the proper approach under the Secretary's regulations would be to apply the grid as if plaintiff were age 45 at the time she filed her application, since in balancing the claimant's age with her residual functional capacity, education and applicable work experience, the Secretary may not "apply these age categories mechanistically in a borderline situation." 20 C.F.R. § 416.963(a). *See Roberson v. Heckler*, 1984 WL 621, *3 n. 5 (S.D.N.Y.1984). *Cf. Harrell v. Bowen*, 862 F.2d 471, 479 (5th Cir.1988) (Secretary has discretion in determining whether an age situation is "borderline."). Such an analysis would require application of Rule 201.17, and would result in a finding of disability.

Wholly apart from the result dictated by the grid regulations, plaintiff's inability to engage in substantial gainful employment in a sedentary job [10] is further confirmed by her established inability to use public transportation on her own to get to work. Finally, I note that the Secretary's grid regulations do not directly take account of non-exertional impairments and cannot be applied to find non-disability without reference to those types of impairments. *See, e.g., Bapp v. Bowen*, 802 F.2d 601, 605–06 (2d Cir.1986). In this case, plaintiff's seizure disorder was deemed sufficiently significant by the ALJ and Appeals Council to preclude her working at heights or around dangerous machinery, and if this limitation is taken into account when utilizing the grid regulations, it becomes still more apparent that plaintiff must be deemed incapable of performing any work, as all of her treating physicians have opined. In short, plaintiff should be deemed disabled and entitled to benefits.

In recommending that this case be remanded solely for the determination of benefits, I take heed of the fact that "[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion." *Vargas v. Sullivan*, 898 F.2d at 296 (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir.1983)). *See also Cruz v. Sullivan*, 912 F.2d at 11. Since this case has already been the subject of a prior remand from this court to rectify various errors on the part of the Secretary, and since it is now approaching seven years since plaintiff filed her initial application, I see no reason to prolong "the often painfully slow process by which disability determinations are made." *Carroll v. Secretary of Health and Human Services*, 705 F.2d at 644. Accordingly, this case should be remanded solely for the determination of benefits.

## CONCLUSION

For the reasons stated, I recommend that plaintiff's motion for judgment on the pleadings be granted, that defendant's motion for judgment on the pleadings be denied, and that the case be remanded to the Secretary solely to calculate benefits.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with

---

**10.** Sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 416.967(a).

the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Robert P. Patterson, Room 308, and to the chambers of the undersigned, Room 503. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 472, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).